The **WHITEHALL CEMENT MANUFAC-TURING COMPANY**, Appellant in No. 15603,

v.

**UNITED STATES** of America, Appellant in No. 15604.

Nos. 15603, 15604.

United States Court of Appeals Third Circuit.

Argued March 8, 1966.

Decided Dec. 9, 1966.

George Craven, Dechert, Price & Rhoads, Philadelphia, Pa., for taxpayers.

Thomas Field, Dept. of Justice, Tax Div., Washington, D. C. (Richard M. Roberts, Acting Asst. Atty. Gen., Meyer Rothwacks, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Drew J. T. O'Keefe, U. S. Atty., Francis R. Crumlish, Asst. U. S. Atty., on the brief), for the United States.

Before SMITH and FREEDMAN, Circuit Judges, and MILLER, District Judge.

## OPINION OF THE COURT

WILLIAM F. SMITH, Circuit Judge.

These appeals are from a judgment in favor of the defendant in an action for the refund of federal income taxes for the years 1951 to 1956, inclusive. The opinions of the district court are reported in 237 F.Supp. 838 and 242 F. Supp. 326 and 327. The controversy pertains to the method employed by the court below in the computation of depletion deductions allowable in the years in question. There is no dispute as to the material facts. We find it necessary to consider only the issues raised on the plaintiff's appeal and these will be separately treated.

### FACTS

The plaintiff was an integrated miner-manufacturer engaged in the production of portland cement. It was the owner of a quarry from which it extracted cement rock which was used exclusively in the manufacture of cement; none of its quarried product was sold or saleable in the open market.

After the rock was quarried it was subjected to a treatment process comprised of the following successive steps: (a) the quarried rock was crushed and reduced to pieces having a maximum dimension of 7/8ths of an inch; (b) the crushed rock was mixed with limestone, cinders or iron ore, and sand, which were purchased in the open market; and (c)

the mix was pulverized[1] and then fed into a kiln in which it was calcined for approximately two hours. The calcination converted the mix into cement clinkers, hard pieces of the size of an ordinary marble. These were blended with gypsum and then ground to a fine powder known as portland cement. The finished product was then stored in silos from which it was ultimately loaded into trucks or freight cars for shipment to consumers.

### PERTINENT PROVISIONS OF THE STATUTES AND REGULATIONS

The depletion allowances for the years 1951, 1952 and 1953 are authorized by the pertinent provisions of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 114(b) (4) (A) (ii) and (B), as amended. Similar allowances for the other years are authorized by the pertinent provisions of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 611(a) and 613 (a), (b) (6) and (c), as amended. For the purposes of this litigation the relevant provisions of the respective codes may be regarded as substantially similar except as to the percentage of gross income from mining allowable as a deduction.

Section 611(a) provides that in "the case of mines, * * *, [and] natural deposits, * * *, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * *, according to the peculiar conditions in each case; such reasonable allowance * * * to be made under regulations prescribed by the Secretary [of the Treasury] or his delegate." Under §§ 613(a), (b) (6) and (c) (1) (2), the taxpayer may claim as a deductible allowance a specified percentage "of the gross income from the property" which, in the case of property other than an oil or gas well, means "the gross income from mining."

Subdivision (c) (2) of § 613 was amended in 1960 (74 Stat. 291, 292) so as to define with more particularity the

---

1. The pulverized mix was comprised of approximately 80% of cement rock and 20% of additives.

stage in integrated operations at which "mining" ended and manufacturing began, the cut-off point for calculating the depletion allowance determined on the basis of "gross income from mining." The amendment defined "mining" as including "not merely the extraction of ores or minerals from the ground but also the treatment processes considered as mining described in paragraph (4) * * *." The said paragraph, as applied in the instant case, describes the treatment processes considered as mining as "all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the kiln, but not including any subsequent process." The obvious purpose of the amendment was to move the cut-off point forward from the crushing to the pre-kiln stage.

■ The amendment as first enacted was made applicable only with respect to taxable years beginning after December 31, 1960. However, by later enactment (74 Stat. 1017, 1018), the amendment was made retroactive and applicable with respect to earlier years and in specific situations, provided the taxpayer elected to have the amendment apply. Such an election was made by the plaintiff. It follows that for the purpose of this litigation "mining" operations ended when the prepared mix, comprised of cement rock and purchased minerals, was fed into the kiln.

■ The method of computing "gross income from mining" as defined in § 613(c) (2), as amended, is prescribed by §§ 39.23(m)–1(e) (3) of Treasury Regulation 118. 26 CFR (1939). Since the plaintiff by its election consented to the application of the 1960 amendments, the computation of "gross income from mining" was made under the following formula:

"* * * If there is no * * * representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (* * *) minus the costs and proportionate profit attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes."

This formula is known as the "proportionate profits method."

### METHOD OF COMPUTATION EMPLOYED BY THE COURT BELOW

■■ It is agreed by the parties that the first marketable product was finished cement. It follows that under the regulation the plaintiff would be entitled to treat as "gross income from mining" the gross income derived from the sale of its finished product minus the cost and proportionate profit attributable to the transportation (other than transportation incident to the pre-kiln stage) and the process beyond the ordinary treatment processes. The method of computation is reflected in the following equation:

$$\frac{\text{mining costs}}{\text{total costs}} \times \frac{\text{gross sales}}{\text{of cement}} = \frac{\text{gross income}}{\text{from mining}}$$

The court below treated as "mining costs" all costs incurred prior to the cut-off point, exclusive of the cost of the minerals; the cost of purchased minerals was excluded, and we think properly so. See Riddell v. California Portland Cement Company, 330 F.2d 16 (9th Cir. 1964); Standard Lime and Cement Company v. United States, infra, 949. There is no allowance made for the value of cement rock.

There is no dispute here as to the validity of the regulation. However, the plaintiff maintains that the allocation of

total gross income between mining and non-mining operations solely on the basis of proportionate costs did not fairly reflect its gross income from mining. It is argued that the "proportionate profits method," as applied in the instant case, has resulted in the allocation of a disproportionate share of total gross income to non-mining operations, thus diminishing the depletion allowance which, under the statute, is determinable on the basis of gross income from mining.

The plaintiff argues that in the calculation of gross income from mining the costs and profits attributable to the purchased minerals should be eliminated on a tonnage basis and not on the proportionate profits basis adopted by the court below. As an alternative to the proportionate profits formula the appellant urges the application of a two step method, the initial step of which is reflected in the following equation:

$$\frac{\text{weight of cement rock}}{\text{weight of all ingredients}} \times \frac{\text{gross income}}{\text{from cement}} =$$

The resulting figure would represent the gross income from cement rock, approximately four-fifths of the total gross income from cement.

The gross income from cement rock would then be allocated between mining and non-mining operations in the proportion in which pre-kiln direct costs allocable to cement rock bear to the total direct costs allocable to cement rock. The second step of the method is reflected in the following equation:

$$\frac{\text{pre-kiln direct costs allocable to cement rock}}{\text{total direct costs allocable to cement rock}} \times \frac{\text{gross income from cement rock}}{} =$$

According to the theory advanced by the appellant the resulting figure would more fairly reflect gross income from mining, the depletion base.

The method suggested by the plaintiff does not conform to the regulation and cannot be accepted as valid. The formula prescribed by the regulation is cost oriented and requires an allocation of total gross income between mining and non-mining operations in the proportion which mining costs bear to the total costs of the cement sold. Standard Lime and Cement Company v. United States, 329 F.2d 939, 944, 165 Ct.Cl. 180 (1964); United States v. Portland Cement Company of Utah, 338 F.2d 798, 802 (10th Cir. 1964). The relative weights of purchased minerals and cement rock has no relevance to costs and profits, the determinative factors in the formula. The suggested modification of the formula by the introduction of a fraction based on such weights would result in a disproportionate allocation of total gross income to gross income from mining, thus exaggerating the depletion base.

The plaintiff argues that the unfairness of the defendant's formula lies in its failure to assign any value to "cement rock before it is quarried." The court below answered this argument as follows:

"It is true that in the computation of the costs and profits to be included in taxpayer's gross income from mining, no actual valuation was given to the cement rock unextracted from taxpayer's quarries. However, it must be

remembered that the very depletion allowance taxpayer seeks, is intended to compensate it for the loss of its capital asset, the cement rock." 242 F.Supp., supra, 327.

This rationale is supported by Commissioner of Internal Revenue v. Southwest Expl. Co., 350 U.S. 308, 312, 76 S.Ct. 395, 100 L.Ed. 347 (1956) and Kirby Petroleum Co. v. Commissioner of Internal Revenue, 326 U.S. 599, 602, 603, 66 S.Ct. 409, 90 L.Ed. 343 (1946).

■ The plaintiff maintains that the application of its method is justified under the following exception contained in the regulation:

"If the taxpayer establishes to the SATISFACTION OF THE COMMISSIONER that another method of computation, other than the computation of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method." (Emphasis added).

We are of the opinion that under the facts and circumstances of the instant case the exception is inapplicable.

The statute, § 611(a), supra, vests in the Secretary of the Treasury or his delegate the power to promulgate the regulations under which "reasonable allowances for depletion" shall be made. It appears from a construction of the regulation as a whole that a method of computation, other than that prescribed, may be used by the taxpayer only upon a determination by the Commissioner of Internal Revenue that another method "clearly reflects the gross income from property." Absent such a determination, the method of computation prescribed by the regulation must be employed.

### ALLOCATION OF BULK LOADING COSTS

■ The term "bulk loading costs" refers to the costs of loading bulk cement into freight cars and trucks for delivery to customers. The court below held that these costs and the proportion of profits attributable thereto were allocable solely to the non-mining operations; this treatment decreased the depletion base. The plaintiff maintains that the court erred. It argues that these costs and profits should have been ratably allocated between mining and non-mining operations; this treatment would increase the depletion base. We cannot agree with the plaintiff's position.

As was hereinabove noted, mining ended when the prepared mix, comprised of cement rock and purchased materials, was fed into the kiln. Under the regulation only the costs incurred in the pre-kiln stage of the integrated operations and the profits attributable thereto are properly allocable to "mining" as defined by the statute. The loading of cement for shipment was a service rendered in connection with transportation as that term is used in the regulation. It bore no relation to "the extraction of * * * minerals from the ground" and the treatment processes "applied prior to the introduction of the kiln feed into the kiln," defined in the statute as "mining." It follows that in the calculation of the depletion base bulk loading costs were allocable only to the post-kiln stage of the integrated operations. Standard Lime and Cement Company v. United States, supra, 329 F.2d 948. The profits attributable to such costs were similarly allocable. Ibid.

### CEMENT SOLD IN BAGS

■ During each of the years in question the plaintiff sold its finished product not only in bulk but also in bags. The mill price for cement sold in bulk ranged from $2.60 to $3.20 per barrel of 376 pounds; the mill price for cement sold in bags ranged from $2.90 to $3.60 per barrel of 376 pounds. The latter price included a premium which was less than the packaging costs, including the cost of the bags. The premium ranged from 30¢ to 40¢ per barrel.

Although the additional revenue derived from the sale of cement in bags was insufficient to cover packaging costs

the plaintiff realized a profit from such sales. This profit was less than that which would have been realized from the sale of the same cement in bulk but the difference did not represent an actual loss. The plaintiff nevertheless maintains that in each of the years in question it sustained a calculable loss equal to the difference between the packaging costs and the additional revenue derived from the premiums. With this as a premise it is argued that the additional revenue should be excluded from gross income and that the packaging costs should be similarly excluded from total costs. These exclusions would result in a modification of the allocation fraction and consequently an increase of the depletion base. We think that the court below properly resolved the issue raised by the argument.

There is implicit in the plaintiff's argument an erroneous assumption that the packaging costs produced only the additional revenue derived from the premiums, and this was less than the costs. The sale of cement in bags was presumably an accommodation to those customers whose particular requirements were such as to make the purchase of cement in bulk commercially unfeasible. The availability of packaged cement was undoubtedly a sales inducement to such customers. It seems reasonable to infer that the profits realized from the sale of packaged cement, and these were substantial, were attributable at least in part to the packaging costs. We are of the opinion that packaging costs, like bulk loading costs, were properly allocable to the non-mining operations. Standard Lime and Cement Company v. United States, supra; Riddell v. Victorville Lime Rock Co., 292 F.2d 427, 436 (9th Cir. 1961). The profits attributable to such costs were similarly allocable. Ibid.

Since the defendant has here prevailed on the issues decided in its favor by the court below, its appeal will be dismissed.

The judgment of the court below will be affirmed.