## GENERAL PORTLAND CEMENT COMPANY

v.

## UNITED STATES of America.

Civ. A. No. 3–5212–F.

United States District Court,
N. D. Texas,
Dallas Division.

May 17, 1977.

Buford P. Berry, Dallas, Tex., for plaintiff.

Eldon B. Mahon, U. S. Atty. by Martha Joe Stroud, Asst. U. S. Atty., Eugene G. Sayre, Tax Div., Dept. of Justice, Dallas, Tex., William W. Guild, Atty.-in-Charge by Peter J. Grabicki, G. Tomas Rhodus, Attys., Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OF DECISION

### I. NATURE OF CONTROVERSY

ROBERT W. PORTER, District Judge.

Plaintiff, General Portland Cement Company (the name of which has been changed to General Portland, Inc.), complains that the United States (hereinafter referred to as the IRS or Service) erroneously assessed and collected $2,178,046.42 for the taxable years beginning December 31, 1960, through and including December 31, 1968.[1] Plaintiff urges an increase in the amount it has been allowed to take as a depletion deduction arguing that specific costs and income are properly attributable to plaintiff's mining operation. Finding both jurisdiction and venue proper in this case, trial was held, without jury, beginning May 14, 1975. After full consideration of all facts, argument, briefs, and for the following reasons it is decided that:

1. | Taxable Year Ended | Income Tax | Interest | Total |
|---|---|---|---|
| December 31, 1960 | $149,637.97 | $ –0– | $149,637.97 |
| December 31, 1961 | 148,939.82 | 37,596.07 | 186,535.89 |
| December 31, 1962 | 131,993.24 | 31,018.17 | 163,011.41 |
| December 31, 1963 | 142,578.10 | 24,951.12 | 167,529.22 |
| December 31, 1964 | 229,494.64 | 100,140.62 | 329,635.26 |
| December 31, 1965 | 278,523.55 | 104,656.44 | 383,179.99 |
| December 31, 1966 | 254,661.78 | 80,778.09 | 335,439.87 |
| December 31, 1967 | 96,631.31 | 25,277.90 | 121,909.21 |
| December 31, 1968 | 283,249.99 | 55,917.61 | 341,167.60 |

(See Stip. P.5 filed May 9, 1973)

1. The "bag premium" (increased price on the sale of bagged cement) is an increase in the sales price of cement sold and may not be set-off against "bag costs".
2. The cost of bags and the cost of packing and loading cement is a direct manufacturing expense;
3. The cost of owning and operating terminal facilities is a direct manufacturing expense;
4. The discount which was granted by General Portland to its customers is a cash discount and therefore does not reduce the price of the cement which was sold but rather is a financial expense which is allocable; and
5. The interest expense of borrowed funds can be netted with interest income and included in allocable administration overhead.

The conceptual question posed in this decision is whether this Court will characterize certain costs as direct mining costs, direct manufacturing costs, indirect expenses, or costs related neither to mining nor manufacturing. It will also be necessary to decide either to include or exclude certain income items from the total dollar amount of gross sales derived from cement. To analyze those questions the proper factual and legal framework must first be developed. Therefore I begin in Section II by outlining the method by which cement is manufactured and marketed as well as by describing the underlying economic condition of the cement industry generally and General Portland in particular. In Section III, I develop a legal framework for the proportionate profits method and analyze the actual dynamics of the arguments presented to the court. That is, I demonstrate the "moving force of" each argument in general terms using simple arithmetic computations as examples. Section IV presents a detailed analysis of each cost or item of income and an application of the correct rule of law to the specific issues in

dispute. Finally, Section V contains a summary of the Court's conclusions as well as an order to prepare judgment.

## II. BACKGROUND

### A. The Making of Cement.

General Portland is an integrated mining and manufacturing company which produces cement and cement products. During the years at issue in this suit, Plaintiff mined limestone, clay and shale[2] and processed those raw materials into finished cement at nine locations in the United States. The plants were divided among five divisions, and the department leader at each division reported directly to each of his superiors at corporate headquarters.

The manufacture of cement begins with limestone, shale, or clay which is first mined at a quarry and then transported to a primary crusher which reduces the size of the ore. That crushed ore is stockpiled near the processing plant along with other necessary minerals which are either purchased or extracted from Plaintiff's quarries. Water is added and the minerals are further ground, creating a mixture which has the appearance of mud and is called "slurry." Slurry is then pumped into large slurry-blending, and storage tanks where it is agitated continually to keep the solids from settling and to keep the mixture homogeneous. From the slurry-blending tanks, the slurry is then pumped into a rotary kiln where it is heated. A series of chemical reactions take place as the slurry is transformed by the heat into which is termed a "cement clinker". The cement clinker is cooled and later the clinker, along with gypsum, is ground into finished cement which is transported to storage silos at the plant or at distribution terminals. There is no dispute between the parties with regard to the actual methods of manufacturing used by the Plaintiff.

### B. The Marketing of Cement.

Plaintiff sells the cement which it produces either in bulk or in paper bags. Ce-

---

2. For the years in question the applicable percentage depletion rates were 15% for limestone, and clay and 5% for shale. (Stip. P.10)

ment in bulk is loaded directly from a storage silo into a rail car, barge, or truck for shipment. Upon receiving an order for bagged cement, the finished cement is transported from the storage silo to a bagging machine. There is no chemical or practical difference between the cement loaded from the storage silo to a truck or a barge and that loaded into a bag. Plaintiff did not keep an inventory of packaged cement but rather filled bags only when actual orders were received. From ten to twenty percent of Plaintiff's gross sales were attributable to the sale of cement in bags during the years 1961 through 1968. A higher price was charged by Plaintiff for cement sold in bags as compared to cement sold in bulk; that additional price is termed a "bag premium" by the industry.

The amount of the bag premium during each of the years in question was approximately ten to fifteen cents per bag.[3] It is Plaintiff's contention that it intended to recoup, if possible, the additional cost incurred in bagging cement and that the bag premium was not an increase in the price of cement. In support of that contention Plaintiff elicited testimony that its corporate headquarters, which set the amount of the bag premium, collected information from the division accounting departments concerning the cost of bags, and from the plant operations departments concerning the cost of packing and loading the bags, in order to determine the additional costs incurred in bagging the cement and by that process established the amount of the bag premium. It is further argued that the bag premium charged by the Plaintiff did not exceed the cost of the bags plus the additional costs incurred in packing and loading the cement in bags.

During each of the years in issue, Plaintiff offered a cash discount to its customers for prompt payment. The amount of the discount through November 1, 1961 was ten cents per barrel for white cement. From about November 1, 1961, and through December 31, 1968, the discount was twenty cents per barrel for gray cement and forty cents per barrel for white cement. The basic terms of the discount through January 1, 1964 were:

> Discount if payment made within fifteen days from the date of invoice, full payment due within thirty days of invoice.

From January 1, 1964 through December 31, 1968 the basic terms of the discount were:

> Discount allowed if payment made by the 10th of the month for shipment invoiced during the previous month, full payment due by the last day of the month following the month of shipment.

Similar cash discounts had been offered by the Plaintiff since at least 1948. Most other competing cement manufacturers also offered what they termed a "prompt payment discount" with terms similar to those offered by the Plaintiff. As the industry discount would rise or fall, Plaintiff would meet those changes.

Plaintiff advised all of its customers of the terms of its discount through trade quotations, specific work contracts, and sales invoices. The sales invoices which were transmitted to the customer for payment reflected the total invoice price, without reduction for the discount, and a separate statement contained the discount amount. Plaintiff did not charge its customers anything denominated interest on accounts paid beyond the date specified in the invoice. If the account remained unpaid for more than ninety days, the Plaintiff would generally attempt to obtain a promissory note from the customer in the amount owing on the account and bearing interest at four to five percent per annum.

Between 1961 and 1968, ninety to ninety-five percent of Plaintiff's customers took

| 3. Year | Amount of the Bag Premium | Year | Amount of the Bag Premium |
|---|---|---|---|
| 1960 | $1,787,144.99 | 1964 | 1,980,093.28 |
| 1961 | 1,823,833.00 | 1965 | 2,014,359.28 |
| 1962 | 1,746,473.87 | 1966 | 2,022,488.11 |
| 1963 | 2,000,105.07 | 1967 | 1,938,161.07 |
| | | 1968 | 2,340,487.48 |

advantage of the discount offered to them. Approximately eighty to eighty-five percent of those who did not take advantage of the discount complied with Plaintiff's terms by transmitting the total price to Plaintiff after the expiration of the discount period. The remainder of the customers who did not earn the discount offered by Plaintiff attempted to take advantage of the discount without complying with the discount terms, by transmitting the next payment to the Plaintiff after expiration of the discount period. In those situations the Plaintiff, disallowed for the most part, the discount claimed by the customer and rebilled the customer.[4]

Since 1950, Plaintiff has allowed the division sales manager to determine whether a discount should be disallowed if the net payment was received within three days from the end of the discount period. The three day grace period was initiated in response to tardy postal service. On occasion the division sales manager disallowed discounts taken by customers where the payment was received within the three day grace period and the customer was habitually late in payment. The division sales manager did not have the authority to allow a discount where the net payment was received more than three days after the end of the discount period. A discount taken after that period could be allowed only upon approval by corporate headquarters. If the division accounting office received a payment more than three days after the end of the discount period when the discount had been taken, the division sales manager could disallow the discount taken, or, if he felt it should be allowed because of extenuating circumstances, he transmitted the invoice and related materials to Plaintiff's corporate headquarters for consideration of whether to grant the allowance.

After the corporate headquarters had determined whether the discount should be allowed the division accounting office took the appropriate action to either rebill the unearned discount or credit the customer's account for the discount which was allowed. The division accounting office rebilled those disallowed discounts by sending the customer a letter advising him that he had not complied with the payment terms necessary to earn the discount and, therefore, he would be required to pay the gross amount of the original invoice. Plaintiff also required each division accounting department to submit monthly reports regarding cash discounts to its corporate office headquarters. Annual statistics compiled from those reports reveal that Plaintiff collected approximately 90% to 93% of all of its invoices for the years 1960 through 1967 within the discount period, which included the three-day grace period for mailing.[5]

### C. The Business of Cement.

The Plaintiff was required to invest heavily in automated and semi-automated equipment to manufacture cement. Hence the fixed costs of producing cement is and was high in comparison to those costs which are variable such as the cement ingredients. The profit maximizing manufacture with such a debt structure will attempt to increase production to capacity so that all fixed cost assets are contributing as much as they profitably can. Testimony revealed that the average cement producer must invest approximately one dollar of capital for each thirty-three cents of annual sales. Since cement produced by one company is all but identical to the cement produced by others, there can be competition only among products in terms of price and services.

Throughout the decade of the fifties the cement industry enjoyed high demand and expanding capacity. That demand was attributable in large part to the relatively quick-paced growth of the construction in-

---

**4.** The total amount in dollar value disallowed from 1960 through 1967 is $1,300,000.

**5.** A compilation of the monthly reports was not prepared for 1968 because the company adopted a more decentralized corporate structure in 1967 after moving its corporate headquarters to Dallas, Texas from Chicago, Illinois. Hence it was not possible to generate statistical information.

dustry and in particular to the growth of highway construction. During the early sixties industry conditions changed and capacity utilization dropped from a high of 95% in 1955 to 74% in 1960 and remained at about that rate throughout the sixties. Prices dropped from $3.37 per barrel in 1960 to $3.15 per barrel in 1966.

The trends of the industry were characteristic of General Portland. Net sales increased from approximately $40 million in 1955 to $67 million in 1959, an increase of 67%, but dropped below the 1959 level through 1965 and only increased to $74 million in 1967. Throughout the sixties General Portland enjoyed a relatively liquid financial structure. The company's ratio of assets to liabilities was never below 2.5, and for a majority of the years in question was in excess of 3. well above the national average of 2. General Portland's strong financial posture is also reflected in the relatively low ratio of long-term debt to equity which was never greater than 13.6%. In 1965, General Portland arranged a two-year $15 million revolving credit at the prime commercial rate. That arrangement was extended in 1967 even though the Plaintiff was not drawing on those funds.

### III. THE PROPORTIONATE PROFITS METHOD

 Depletion is designed to recompense the taxpayer for the exhaustion of his mineral assets. See *United States v. Cannelton Sewer Pipe,* 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). In the present case, the taxpayer has computed the amount of its allowable depletion as a specific percentage of the annual gross income from the property mined. At no time can the percentage depletion, so computed, exceed fifty percent of taxable income from the property mined. *IRC* § 613(a). If Plaintiff were simply a mining operation and sold its ore to the highest bidder in the open market there would be no difficulty determin-

ing the gross income earned from the sale of the "mined property". But the taxpayer is an integrated miner-manufacturer and there is, in fact, no sale of the mined ore to the manufacturing stage of its operation. Therein lies the problem of this case. How is one to determine the income from something which is not actually sold?

The Service and the Courts have allowed a percentage of the gross sales of the first salable product to be allocated to the mining operations in the same proportion that mining costs bear to the total costs of the entire mining and manufacturing operation. Certain expenses, such as administrative overhead, are not directly attributable to either mining or manufacturing but benefit the entire operation and hence may be allocated between the mining and manufacturing operations in the same ratio as direct mining and manufacturing costs bear one to the other. Separate income, such as that from a separate economic enterprise, are not allocated between mining and manufacturing because the costs of that separate economic entity bear no relationship to the income of the property mined. If costs are not in fact "producing" costs or they do not benefit the entire operation, then they would distort the proportional relationship and reflect higher costs and hence more income which ultimately could be used to justify a higher depletion deduction. One can express the proportionate profits method for determining the income attributable to mining by the following equation:

$$\frac{\text{Mining costs}}{\text{Total allocable costs}} \times \text{Gross Sales} = \begin{array}{l}\text{Gross Income}\\ \text{from mining}\end{array}$$

Of course mining costs consist of direct mining costs, all costs which are incurred prior to actually feeding the slurry into the kiln, and all indirect costs, such as administrative and sales costs, which benefit the entire operation. Gross sales consist of the price for the cement multiplied by the quantity of sales. Thus a more articulated form the equation would read:

$$\frac{\text{Direct and Indirect mining costs}}{\text{(Direct and indirect mining costs plus Direct and indirect manufacturing costs)}} \times (P \times Q) = \begin{array}{l}\text{Gross Income} \\ \text{From Mining}\end{array}$$

To increase the gross income from mining and therefore the amount of the depletion deduction one would expect the taxpayer to argue for the highest price and quantity possible, for other income from related enterprises to be included in the gross sales figure, and for more costs to be allocated as indirect mining costs. The government would no doubt argue the converse so as to lower the amount characterized as gross income from mining. With this factual and legal predicate established I now turn to the specific issues of this case.

## IV. THE SPECIFIC ITEMS IN DISPUTE

In this case five distinct arguments are made concerning the characterization of certain costs and income. There is one alternative issue which is urged but because of the outcome of my decision on the primary issues it does not need to be decided today. The primary issues for decision are:

1. Whether the additional charge made by Plaintiff to its customers when it sold cement in paper bags (known as a "bag premium") should be deducted from the sales price in computing Plaintiff's gross sales and offset against bag costs and related packing and loading costs in the computation of gross income from mining under the proportionate profits method;

2. (a) Whether the cost of bags and the cost of packing and loading cement are indirect expenses allocable to both the mining and manufacturing operations of Plaintiff in computing gross income from mining under the proportionate profits method or in the alternative;

 (b) Whether the cost of bags and the cost of loading and packing cement incurred by Plaintiff should be excluded in computing gross income from mining under the proportionate profits method;

3. (a) Whether the expenses incurred by Plaintiff in owning and operating terminal facilities for selling cement are indirect expenses allocable to both the mining and manufacturing operations of Plaintiff in computing gross income from mining under the proportionate profits method; or in the alternative;

 (b) Whether the expenses incurred by Plaintiff in owning and operating terminal facilities for selling cement should be excluded in computing gross income from mining under the proportionate profits method;

4. Whether interest expenses should be reduced by the amount of interest income to the extent of interest expense, to determine the amount of administrative expense to be used in computing gross income from mining under the proportionate profits method;

5. Whether the discounts offered by the Plaintiff to its customers during each of the years in issue are "cash" discounts and not "trade" discounts for the purposes of computing depletion under the proportionate profits method.

Each is discussed in turn below.

*A. Bag Premium, Bag and Terminal Cost Issues.*

■ The Plaintiff urges in its first three issues that the "bag premium" should be set-off against the costs of bagging cement and that the remaining bagging costs and also terminal distribution costs should be allocated as indirect costs in the same proportion as the direct mining (pre-kiln) costs bear one to the other. In support of those assertions Plaintiff argues two propositions: (i) that the "price" of cement should and is set by the first marketable product which is bulk and not bagged cement and (ii) that the actual producing or manufacturing stage of cement ends at the plant storage silo and that costs incurred in distribution are either indirect costs, attributable to both mining and manufacturing, or excludable non-mining, non-manufacturing costs.

Throughout the period of time relevant to this decision, the regulations in force have required that gross sales be derived from the first marketable product.[6] The Service argues that Treasury Regulation § 1.613, the most recent regulation which was instituted in 1968 dealing with the apportionment of costs and the derivation of gross income, should be applied retroactively. If applied retroactively that regulation would characterize the "bag premium" as a sales price and the costs of bagging and satellite-non-plant-site terminal facilities as direct manufacturing costs. Because I independently reach an identical characterization under the old regulations I need not and do not make any decision on the retroactive application of Treasury Regulation § 1.613.

The Plaintiff, of course, urges this court to exclude the costs of bagging and the costs of the satellite terminal facilities or in the alternative to include them as indirect distribution or sales expenses: costs apart from processing or manufacturing costs. The complexity of the Plaintiff's argument are not to be underestimated; in an interrelated set of propositions Plaintiff attempts to create both the mood and the proper logical foundation for its conclusion. The first step in Plaintiff's argument involves the "bag premium" or extra price charged for bagged cement. One would of course expect that the Government would be seeking to reduce the price or to exclude the bag premium so as to reduce gross income from sales which is the multiplicand in the proportionate profits method formula. Nevertheless, in this case the Plaintiff is

arguing for the exclusion of the bag premium. Why? Because the "bag premium" when set-off against the "bag costs", which logically must be excluded if the "bag premium" is excluded, would result in the elimination of a cost which would increase the denominator of the proportionate profits formula and decrease, by a multiple, the gross income. Thus, the issues of the cost of bagging and the bagging premium are hopelessly intertwined and are therefore considered together below. The satellite terminal issue is also considered in this section because that issue, like the bag cost and premium issues, becomes whether distribution costs are to be included in the manufacturing costs; are to be considered indirect costs; or are to be excluded altogether as non-mining and non-manufacturing costs.

Plaintiff first argues to exclude the bag premium reasoning that that cost is not the price of the first marketable product. The regulations provide that the price variable, in the proportionate profits formula, is to be derived from the price of the first marketable product. Two contentions are submitted by the Plaintiff in support of its position on the bag premium issue. First, it is urged that case law is dispositive of the "fact" that bagged cement is the first marketable product; and second, that Plaintiff's business practice as well as various policy considerations support the proposition that bagged cement should be treated as the first marketable product. Plaintiff's first argument is easily dismissed; it is impossible for a fact in this case to be

---

**6.** Since 1940 the tax regulations have provided that the taxpayer's depletable gross income from mining must be computed under the "proportionate profits method", if no representative market price exists for the taxpayer's production from mining. Regulation 103, Section 19.-23(m)–1(F) (1940); Regulation III, Section 29.-23(m)–1 (1943); Regulation 118, Section 39.-23(m)–1(E)(3) (1953); Treas.Reg.Sec. 1.613–3(d) (1954); Treas.Reg.Sec. 1.613–4(d) (1972). The taxpayer asserts that Regulation 118, Section 39.23(m)–1(E)(3) was in force and provides:

. . . then there shall be used in lieu thereof the representative market or field price of the *first marketable product resulting from any process or processes* . . . minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. (emphasis supplied)

established by those facts established in either of the cases cited by the Plaintiff.[7] The bag premium in this case is a portion of the price of the first marketable product and is simply another means to package and sell cement. In my view, there is no difference between the costs and therefore the price associated with loading bulk cement in a truck or a barge and loading that same cement in a smaller container (a bag) for the convenience of the taxpayer's customers. To say that the cement in the truck and barge is the first marketable product is to defy the reality of the marketing process. Both large and small orders are sold as cement; the only difference between the two methods of sale is how the customer receives his cement. Different legal results which depend upon the mere size of the order of cement are simply not rational. Thus the "bag premium" is to be included in the price figure for cement and is not to be set off against bag costs.

As a correlative holding I must conclude that the costs generated in bagging cement are direct costs of manufacturing. There is no clear line which marks the difference between the costs of manufacturing and distribution. In *Standard Lime* the Court derived what I consider to be an overly rigid test based upon the expert testimony of taxpayer's expert that distribution costs are not considered direct processing costs. *Standard Lime & Cement Co. v. U. S.*, 329 F.2d 939, 948 at n. 21, 165 Ct.Cl. 180 (1964). The Plaintiff attempts to bolster the conclusionary analysis of *Std. Lime* with a two step rationalization. First it is argued that distribution costs are an inherent cost associated with the entire cement operation and that as such those costs should be allocated to both non-mining and mining functions of the plant operation. Second it is argued that if Plaintiff wished to sell the mined kiln feed it would be necessary for it to incur distribution costs and that at least a portion of those distribution costs finally incurred in the retail sale of cement are nothing more than costs which have been delayed until the finished product is manufactured. Therefore it is reasoned that the costs of bags and terminal facilities are indirect expenses which should be allocated between mining and non-mining in the same proportion as direct mining costs bear to the total costs of the operation.

In *Whitehall Cement Manufacturing Co. v. U. S.*, 369 F.2d 468 (3rd Cir. 1966) the Court allocated bagging and packing costs to the non-mining operations of the company. I agree with the analysis of that Court. It is clear that cement stored in a site, even if it is chemically finished cement, is not seen as a finished product by the consumer. It still must be portioned, stored, or packed in a form accessible to the retail market. That is to say, manufacturing and processing means completing the "finished" product and making it salable. Certainly the taxpayer does not contend that the costs associated with loading cement into the storage silos on the plant site are not manufacturing costs. They are packing costs; the taxpayer is readying the cement to be loaded into the truck or barge. How can readying the cement to be purchased in smaller quantities be considered anything but a completion of the manufacturing process? I therefore conclude that bagging costs are necessary to finish the non-mining process and should be included in the direct costs associated with as mining.

■■■ For the above reasons, I also find that the costs of the satellite terminals are direct, non-mining expenses. They too are simply packaging devices which from the consumers viewpoint, simply make the bulk cement accessible. The satellite terminal is the means by which the taxpayer "packages" his product and hence should be included in the non-mining cost. Processing in marketing terms and as that term is used in Regulations means the process of dividing the raw cement into a marketable quantity. See *IRC* 613(c)(4). I cannot conclude, as the Plaintiff vigorously urges, that "process" means only "chemical processing". The proportionate profits method

---

7. *Standard Lime & Cement Co. v. U. S.*, 329 F.2d 939, 165 Ct.Cl. 180, (1964) and *United States v. Ideal Basic Industries Inc.*, 404 F.2d 122 (10th Cir. 1968) are the two cases cited by the Plaintiff.

was developed to distribute costs over the entire range of mining and non-mining activities. To say that satellite terminals are "sales" devices which benefit the entire operation or alternatively that they are distribution facilities which are so removed from mining and manufacturing that they should not be included is to overlook the fact that the consumer only purchases the portioned bulk cement and does not purchase just the bulk cement that is produced by the Plaintiff. Congress must have meant, then, that processing costs includes more than cooking the meal; serving it in portions which are easily handled, which are attractive, and which are accessible to the dinner is when the process of preparing a meal is completed: So too the processing of cement.

### B. Interest Expense.

For the years 1960 through 1964, Plaintiff had interest income primarily from short-term investments in Treasury bills and commercial paper. During that same period, Plaintiff incurred interest expense, which was primarily attributable to interest on $15 million in debentures issued by Plaintiff in 1957. Plaintiff asserts that the earned interest income on the borrowed funds should be reduced by the interest income on that same money to determine the actual "cost" of holding the funds which the taxpayer characterizes as administrative expenses. Plaintiff does not contend that it is entitled to include the interest income in the computation of its gross-income from mining. The sole issues for determination here are (i) whether administrative expenses include interest costs on funds which are used to benefit the entire operation and (ii) whether those expenses may be reduced by interest received on those borrowed funds.

While there is testimony that large capital commitments were made to new manufacturing facilities during the time period that Plaintiff borrowed the funds, there is also testimony that the monies were also used by Plaintiff to improve the operation of the Plaintiff's mining operations. Hence, after full consideration of the record

and with the understanding that all of the money which was held as debt is tangible and cannot be traced specifically from the loan to either mining or manufacturing, I find that the interest costs were properly included in administrative overhead. Thus the only question remaining is whether the interest income earned on the borrowed funds may be set-off against the interest income of those funds. The netting of interest income against interest expense does not change the proportionate profits fraction or Plaintiff's "gross income from mining". The depletion deduction is limited to fifty percent of Plaintiff's "taxable income from the property". IRC § 613(a). Since taxable income is gross income less expenses, reducing Plaintiff's interest expense by the amount of its interest income affects the determination of taxable income from the property and not the gross income figure. Thus, this issue concerns only the determination of Plaintiff's taxable income from "the property" for purposes of the fifty percent limitation and does not affect the determination of the Plaintiff's "gross income" from mining on which percentage depletion is computed.

The Plaintiff did not include or attempt to include its interest in its gross income in computing its gross income from mining. In compiling the fifty percent limitation upon the depletion deduction, however, the Plaintiff reduced its interest expense by the amount of its interest income. The taxpayer also reduced what I have characterized as the indirect cost of the funds by the income earned on those funds. The result of that computation would be to distribute less cost to both mining and non-mining activities. That distribution, however, is in the same proportion as direct mining costs bear to the sum of direct manufacturing and mining costs. In other words, the fraction which is then multiplied by the gross sales income remains the same whether this court increases or decreases the indirect administrative expenses.

In what can only be characterized as a peculiar decision, the tax court in *Island Creek Coal Co. v. Comm.*, 30 T.C. 370 (1958) refused to allow an integrated coal mining

operator to reduce his direct mining costs by income derived from the sale of scrap mine supplies. In an amended answer the Service appears to have urged that the taxpayer should not net the costs and income of the salvaged mining supplies to determine the gross income from the property mined. It is peculiar in the first place that any costs were deducted from the "gross income" figure. Indeed gross income from the property mine means the *gross* or *all the* sales income from the sale of the mined property, the gross income is not reduced by the costs associated with mining. Moreover, it is peculiar that the taxpayer would argue for a reduction in his direct mining costs, a cost which is expressed as the numerator of the proportionate profits fraction and which if increased would increase the percentage income which could be attributed to mining and hence fall within the depletion deduction. *Island Creek*, if it has any precedential value, is strictly limited to its facts and perhaps the oblique trial strategy which dictated its queer result.

Two other decisions are cited by the Service for the proposition that administrative expenses cannot be reduced by interest income. Nevertheless in those two cases, *Guthrie v. United States*, 323 F.2d 142 (6th Cir. 1963) and *Whitehall Cement Co. v. United States*, 369 F.2d 468 (3rd Cir. 1966) the courts were clearly resolving a different issue: whether the gross income figure in the proportionate profits method could be increased by the inclusion of income which was earned from other sources besides mining. In *Guthrie* the taxpayer sought to include insurance proceeds from a "business interruption" policy. Damages under that policy were measured by the difference between the dollar value of coal which was sold and the dollar value of that which was estimated could not have been sold because of the business interruption. The Sixth Circuit correctly reasoned that the purpose of the depletion allowance would be subtracted if a deduction were allowed for income which had no relation to a reduction of the capital stock, property mined, and that therefore income, even if generated from an insurance policy based upon what could have been mined, should be excluded. Similarly the court in *Whitehall Cement Co.* excluded from the gross sales figure, income from the resale of cement purchased from another. It was also held that gross income from the property mined meant just that: no extraneous income should be included within that variable because the depletion deduction should reflect the reduction of the taxpayer's capital stock. *See e. g. United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960).

The Plaintiff in this case, is not attempting to include more income in its gross sales income figure. The Plaintiff is attempting to reduce taxable income by reducing interest cost by interest earned and to decrease its total administrative cost by the same amount. I hold that the Plaintiff is justified and that interest expense may be set-off against interest income in determining the true administrative cost of the entire operation.

*C. The Discount.*

 Finally, Plaintiff urges that discounts given between 1960 and 1968 are "cash" discounts and not "trade" discounts while the Service argues the reverse. As described by the Court in *Standard Lime*:

Cash discounts are granted to purchasers in order to encourage prompt payment thus producing a quicker flow of working capital. They differ from trade discounts in that the latter are granted at the option of the seller no matter when payment is made, depending on market conditions, while the former are availed entirely at the option of the purchaser. Thus trade discounts are deemed reductions in sales price and thus not includible in taxpayer's total gross income, while cash discounts are treated as a financial expense to the vendor and thus includible in taxpayer's gross income.

The determination of whether a particular discount is characterized as one of "trade" or "cash" is a question of fact. This Court must determine whether the taxpayer has proven by a preponderance of evidence that

the discounts were intended to induce prompt payment rather than by a desire to encourage sales. The Service argues that in addition to being conditioned upon early payment, a true "cash" discount must also be substantially equivalent to the interest one would charge for the use of the net amount paid in advance for the period of time that the payment at its latest would be due. See Rev.Rul. 60–257, 1960–2 Cum. Bull. 197. After a review of the following facts, I find that the discounts offered by the Plaintiff are cash discounts and not trade discounts. In arriving at that conclusion I have divided my inquiry into two steps. First I analyze the actual policy and results of the Plaintiff's business to determine whether there was as condition precedent of prompt payment the granting of the discount and secondly I hold that the "interest equivalency" test even if applicable was applied improperly in this case.

Turning to my first determination I find on the basis of the credible facts that:

1. Plaintiff offered the discount to induce early cash payment;

2. The discount was effective in collecting ninety to ninety-five percent of the accounts receivable over the time period at issue in this case;

3. The Plaintiff strictly enforced the cash discount; and

4. Strict enforcement of the cash discount was achieved through close supervision of those personnel who were allowed to give discounts and by closely restricting those who could give the discounts.

Thus unlike the taxpayers in *Southwestern Portland Cement Co. v. United States*, 435 F.2d 504 (9th Cir. 1970) and *United States v. California Portland Cement Co.*, 413 F.2d 161 (9th Cir. 1969) the Plaintiff, in this case, has strictly enforced the discount provision and, for example, while the taxpayer in *California Portland* disallowed only about .035% of the discounts offered, the Plaintiff in this case has disallowed five to ten percent of the discounts which it offered to Plaintiff's customers. General Portland clearly allowed the discounts only on prompt payment.

The Service, however, argues that the discount, even though enforced, varied with the discounts offered by others in the industry and therefore must be viewed as simply a price reduction. The cement is described as a fungible product and it was noted that competition could only take place in price and *services*. Prompt payment or conversely the willingness to allow late payment could be looked upon as a service. To remain competitive the Plaintiff would be required to meet competition in that service. In all fairness there can be little doubt that price was also a factor on the part of the consumer's decision purchase.

The Service tacitly argues that if the Plaintiff did offer a service, that is loaning money for the longer payment period, then that loan must be equivalent to interest. The Service focuses the discount period which it presumes is the time over which the full payment is or will become due if the discounted payment is not made. There is absolutely no evidence that that time period is the proper interval of time. Thus, for example, if payment is not made by the tenth of the month following the sale and the taxpayer is then required to make full payment by the end of the next month, the Service urges that the Court accept as the critical interest period the remaining twenty days in the first month plus thirty days in the next month, or fifty days. The unproven assumption in the Service's argument is that payment is finally made by the thirtieth day. The testimony is to the contrary. Often collection problems occur and collection was not made for some time after the full payment deadline. Thus without an accurate time interval the discount figures which were computed by the Service are baseless. From the taxpayer's point of view the opportunity cost of the discount is measured by the ultimate cost of foregoing the encouragement of prompt payment. Certainly the taxpayer could borrow in the short-run to cover accounts receivable but in the long-run it may be that the discount not only encourages prompt payment but more importantly encourages eventual pay-

ment. Collection costs as well as interest costs must be viewed as one. To apply a simpler more mechanistic test would belie reality and would make a farce out of the concept of opportunity cost. Hence, I conclude that the Plaintiff in this case intended the discount as a cash discount to encourage final payment. The interest equivalency test posited by the Service even if theoretically correct is not applied correctly in this case.

## V. SUMMARY

As provided in Section I, and for the reasons set forth above, I decide:

1. The "bag premium" (increased price on the sale of cement) is an increase in the sales price of cement sold and may not be set-off against "bag costs".

2. The cost of bags and the cost of packing and loading cement is a direct manufacturing expense;

3. The cost of owning and operating terminal facilities is a direct manufacturing expense;

4. The discount which was granted by General Portland to its customers is a cash discount and therefore does not reduce the price of the cement which was sold but rather is a financial expense which is allocable; and

5. The interest expense of borrowed funds can be netted with interest income and included in allocable administration overhead.

The parties to this case are ordered to prepare a judgment which is to be consistent with this opinion within 40 days from entry of this decision.