**GENERAL PORTLAND CEMENT CO., Plaintiff–Appellee Cross–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellant Cross–Appellee.**

No. 77–2831.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1980.

Kenneth J. Mighell, U.S. Atty., Fort Worth, Tex., Martha J. Stroud, Asst. U.S. Atty., Dallas, Tex., David E. Carmack, Gilbert E. Andrews, Acting Chief, App. Section, M. Carr Ferguson, Asst. Atty. Gen., Tax Division, U.S. Dept. of Justice, Wash-

ington, D.C., Grant W. Wiprud, Atty., Tax Div., Francis J. Blanchfield, Jr., Dept. of Justice, Washington, D.C., for defendant–appellant cross–appellee.

Buford P. Berry, Emily A. Parker, Dallas, Tex., Michael J. Roach, Washington, D.C., for plaintiff–appellee cross–appellant.

Before GOLDBERG, FAY, and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

In this case General Portland Cement Co. (sometimes referred to as taxpayer) filed suit for refund of federal income taxes and assessed interest for the years 1960 through 1968 in the total amount of $2,178,046.42.

All of the issues before this court involve the percentage depletion deduction allowed by Section 613 of the Internal Revenue Code of 1954, as amended,[1] and all except the interest issue involve the proportionate profits method. The issues are: (1) the proper treatment under the proportionate profits method of certain items: the bagging premium and the costs of the bagging operation, and the costs of loading bulk cement and other distribution costs; (2) the proper treatment under the proportionate profits method of the discount offered by taxpayer to its customers for prompt payment; and (3) the proper treatment of certain items of interest income and expense in calculating the "50% limit."[2] The district court's decision, reported at 438 F.Supp. 27, sustained the government's position both with respect to the treatment of the cost of loading bulk cement and other distribution costs and with respect to the treatment of the bag premium and the costs of the bagging operations. With respect to these items, we affirm. The district court held for the taxpayer with respect to the proper treatment of the discount; we reverse that

holding. The district court also held for the taxpayer on the interest issue; with respect to that issue, we affirm.

Part I of this opinion will set out certain details concerning the manufacture of cement which we hope will contribute to an understanding of the issues. Part II will explain the mechanics of the percentage depletion deduction and the proportionate profits method. Parts III, IV, and V discuss respectively the three issues listed above. The facts relevant to each issue are set out in the part of the opinion discussing that issue.

## I. THE MANUFACTURE OF CEMENT

Taxpayer is an integrated mining and manufacturing company producing cement. In the production of cement, taxpayer generally extracts limestone (source of calcium carbonate), shale, and/or clay (source of silica, alumina and iron). These minerals are conveyed to a primary crusher which crushes the minerals. The crushed mineral is stockpiled near the cement plant along with other necessary minerals, which are either purchased or extracted from taxpayer's quarries. These materials then undergo a raw grinding process in which water is added to make a mixture having the appearance of mud. The product of this raw grinding process is called "slurry." The slurry is then pumped to large blending and storage tanks where it is continually agitated to keep the solids from settling and to keep the mixture homogeneous. The slurry is then moved from the blending and storage tank as "kiln feed" into a large rotary kiln where it is burned. Complex chemical reactions occur in the kiln, and a cement clinker results from this burning process. The cement clinker is cooled, and later the clinker, along with gypsum, is ground into finished cement. The finished cement is then conveyed to storage silos at the plant where it is stored until it is shipped by rail, barge, or truck, either directly to taxpayer's customers or to distribution terminals oper-

---

1. Hereafter in this opinion, reference to the Internal Revenue Code will simply be to section numbers, without further designation.

2. Section 613(a) limits the percentage depletion deduction to 50% of the taxpayer's taxable income from the property.

ated by taxpayer in cities other than those where taxpayer maintains plants. When cement has been transported to a distribution terminal, customers may take delivery there or it may be shipped to them from there. Taxpayer loads the bulk cement from the storage silo, located either at the plant or at a distribution terminal, directly into rail cars, barges, or trucks for shipment.

Approximately 10% to 20% of taxpayer's sales are in bags, rather than in bulk. Upon receiving an order for bagged cement, the finished bulk cement is conveyed from the storage silo to a bagging machine. After the bag is filled according to weight, the bagged cement is hand loaded onto a truck or rail car for shipment to the customer.

## II. PERCENTAGE DEPLETION DEDUCTION AND PROPORTIONATE PROFITS METHOD

The percentage depletion deduction provided by Section 613 is calculated by multiplying "gross income from mining" by the applicable rate.[3] If taxpayer mined his mineral and sold it in crude form at the mine, his "gross income from mining" would simply be his gross sales price. However, when a taxpayer uses his crude mineral in a manufacturing operation, he has no sales price for the mineral itself. The sales price of the manufactured product—cement in this case—cannot be used, because to do so would give the taxpayer an inflated deduction based on the price of the manufactured product, which includes the value of the crude mineral plus the value added by the manufacturing processes. The purpose of the percentage depletion deduction is to compensate a taxpayer for the exhaustion of his mineral, not for the exhaustion of his manufactured product. Therefore, the deduction is a percentage of "gross income from mining" rather than gross income

from manufacturing. When the only sales price is a sale of a manufactured product, the problem is how to calculate "gross income from mining." If the mineral were sold in crude form by other persons or corporations, there might be a "representative market price" for the mineral which could be used. Where there is no "representative market price," as in this case, the regulations[4] require the use of the proportionate profits method. This method apportions the gross income from the manufactured product between the mining phase and the manufacturing or nonmining phase in proportion that "mining costs" bear to "total costs."[5] The formula is expressed as follows:

$$\frac{\text{Mining costs}}{\substack{\text{Total costs} \\ \text{(mining + nonmining)}}} \times \text{Gross sales} = \substack{\text{Gross income} \\ \text{from mining}}$$

By apportioning gross income on the basis of the ratio of mining costs to total costs, the formula assumes that each item of cost produces a pro rata share of the profits.

Under the proportionate profits method, one crucial determination is ascertaining which are mining costs, and which are not. As a general matter, that determination is controlled, in the case of cement, by Section 613(c)(4)(F). That section provides:

(4) **Treatment processes considered as mining.**—The following treatment processes where applied by the mine owner or operator shall be considered as mining to the extent they are applied to the ore or mineral in respect of which he is entitled to a deduction for depletion under section 611:

\* \* \* \* \* \*

(F) in the case of calcium carbonates and other minerals when used in making cement—all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the

---

3. For the years at issue, the applicable percentage depletion rates were 15% for limestone and clay, and 5% for shale.

4. Treas.Reg. 1.613–4(d). To the same effect was the Regulation in force during most of the years at issue, Treas.Reg. 118, § 39.23(m)–1(e)(3).

5. Indirect costs which benefit the entire operation, e. g., overhead expenses, are usually allocated between mining costs and nonmining costs in the proportion that direct mining costs bear to total direct costs. Treas.Reg. 1.613–4(d)(4)(iii).

kiln, but not including any subsequent process;

The statute provides that some treatment processes are considered part of mining. In the case of cement, the statute provides, and the parties agree, that mining includes all processes applied prior to the introduction of the kiln feed into the kiln, but does not include any subsequent process. This point at which the mining phase ceases and the manufacturing or nonmining phase begins is called the "cutoff" point.[6] In the first issue of the instant case, discussed in Part III, we are concerned with the proper treatment of certain costs incurred after the "cutoff" point.

The proportionate profits method begins with the sales price or gross income from the manufactured product (cement) and arrives at a constructive figure for the sales price of the mineral, namely, "gross income from mining." In this way the taxpayer is allowed a deduction based upon gross income attributable to his mining operations. It is apparent that the proportionate profits method includes within "gross income from mining" all mining costs and the pro rata profits attributable thereto, and, conversely, excludes from "gross income from mining" all nonmining costs and the pro rata profits attributable thereto.

In this opinion we sometimes refer to "gross income from mining" as taxpayer's depletable base, since taxpayer is entitled to a percentage depletion deduction based on "gross income from mining."

## III. COSTS OF LOADING AND OTHER DISTRIBUTION COSTS, AND THE BAGGING OPERATION

### A. Facts and Posture of the Issues.

In this part of our opinion, we consider the proper treatment, in applying the proportionate profits formula, of the following items: (1) bag premium; (2) cost of the bags and cost of packing and loading the bags; (3) cost of loading bulk cement onto rail cars, barges, or trucks; and (4) cost of owning and operating the distribution terminals which taxpayer maintains for the purpose of having cement readily available for delivery in areas where taxpayer has no plant.[7]

A higher price was charged by taxpayer for cement sold in bags as compared to cement sold in bulk. This additional amount is known in the industry as a "bag premium." The amount of the bag premium during each of the years in question was approximately 40¢ to 60¢ per barrel, or 10¢ to 15¢ per bag. In setting and charging the bag premium, taxpayer intended to recover the additional costs incurred in placing the cement in bags, in order to realize a profit on bagged cement equal to the profit on bulk cement. Taxpayer's corporate headquarters, which set the amount of the bag premium, collected information concerning the cost of the bags and the cost of packing and loading the bags in order to determine the additional costs incurred in the bagging operation, and thereby established the amount of the bag premium. The parties stipulated that, during the years in issue, the amount of the bag premium charged by taxpayer did not exceed the cost of bags plus the additional costs incurred in packing and loading the cement in bags.

With respect to the bag premium and the costs of the bagging operation, the taxpayer argues that the bag premium should be "netted" against so much of the costs of the bagging operation as equals the amount of the premium and that both should be excluded from the proportionate profits formula.[8] The government argues that the

6. The mining phase includes all pre–kiln processes except preheating the kiln feed. Section 613(c)(4)(F). Because preheating is not in dispute in this case, we refer here to the "cutoff" point as being the point just before the kiln feed is introduced into the kiln.

7. We refer in this opinion to the costs listed as (3) and (4) as the "costs of loading and other distribution costs."

8. Taxpayer would treat the excess of the bagging costs over the amount of the premium in the same manner taxpayer urges for the loading and other distribution costs, i. e., either allocated between the mining and nonmining phases or, alternatively, simply excluded from the formula.

bag premium should be included as part of the "gross sales" figure in the formula, and that the entire cost of the bagging operation is a "nonmining cost" and should be included in the denominator of the proportionate profits fraction. The treatment sought by taxpayer, while it would reduce the "gross sales" figure (which would seem adverse to taxpayer), would decrease the denominator of the fraction, thereby increasing the fraction, and would result in an overall increase in "gross income from mining." Thus, taxpayer's percentage depletion deduction would be increased. The district court sustained the government's position, and we agree.

With respect to the costs of loading and other distribution costs, the taxpayer argues first that these costs are indirect costs which benefit the entire operation and therefore should be allocated in part to "mining costs" and in part to "nonmining costs." Recalling the formula, it is apparent that this treatment would, as compared to treating such costs entirely as "nonmining costs" as the government urges, decrease the denominator and therefore increase the fraction by which "gross sales" is multiplied, increase "gross income from mining," and therefore increase taxpayer's percentage depletion deduction. The district court sustained the government's position, holding that such costs are entirely nonmining costs. We agree. The district court also rejected taxpayer's alternative argument that such costs should simply be excluded from the formula. The effect of excluding these costs (which would otherwise be nonmining) is to reduce the denominator of the fraction, thereby increasing the fraction and ultimately increasing the percentage depletion deduction. We also affirm the district court's rejection of this alternative argument.

Our discussion in Part III will include: in Subpart B, a discussion of the applicability of the 1968 regulations; in Subpart C, an analysis of the controlling case law and the

proportionate profits regulation in effect in taxable years 1960 through 1967; in Subpart D, the application of the controlling law to the bag premium and the costs of the bagging operation; and in Subpart E, the application of the controlling law to the costs of loading and other distribution costs.

B. Application of 1968 Regulations

In July 1968, regulations were promulgated [9] which provide in pertinent part as follows:

*Reg. 1.613–3(b)(1)*

.    .    .    .    .

For the purpose of this section, "ordinary treatment processes" (applicable to the taxable years beginning before January 1, 1961) and "treatment processes considered as mining" (applicable to the taxable years beginning after December 31, 1960) will be referred to as "mining processes." Processes, including packaging and transportation, which do not qualify as "mining" will be referred to as "nonmining processes."

*Reg. 1.613–3(d)(1)(iv)*

As used in this section, the term "first marketable product or group of products" means the product (or group of essentially the same products) produced by the taxpayer as a result of the application of nonmining processes, in the form or condition in which such product or products are first marketed in significant quantities by the taxpayer or by others in the taxpayer's marketing area. For this purpose, bulk and packaged products are considered to be essentially the same product.    .    .    . For example, if a cement manufacturer sells his own finished cement of various types in bulk and bags and also sells concrete blocks or dry ready–mix aggregates containing additives, the finished cement of various types, in bulk and bags, constitutes the first marketable product or group of products produced by him.

*Reg. 1.613–3(d)(4)(i)*

**9.** T.D. 6965, 1968–2 C.B. 265 (1968). These regulations were later incorporated without substantial change as part of § 1.613–4 of the

current regulations. Elsewhere in our opinion we sometimes refer to the current regulations.

Except as specifically provided elsewhere in this section, when determining gross income from the property by use of the proportionate profits method or any other approved method which is based on the taxpayer's costs, the costs attributable to mining transportation shall be treated as mining costs, and the costs attributable to nonmining transportation shall be treated as nonmining costs. Accordingly, except as specifically provided elsewhere in this section, all profits attributable to mining transportation shall be treated as mining profits, and all profits attributable to nonmining transportation shall be treated as nonmining profits. For this purpose, mining transportation means so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to plants or mills in which other mining processes are applied thereto as is not in excess of 50 miles. *Reg. 1.613–3(d)(4)(iii)*

In determining gross income from the property by use of the proportionate profits method (or any other approved method which is based on the taxpayer's costs)—

*(a)* The costs attributable to containers, bags, packages, pallets, and similar items as well as the costs of materials and labor attributable to bagging, packaging, palletizing, or similar operations shall be considered as nonmining costs.

*(b)* The costs attributable to the bulk loading of manufactured products shall be considered as nonmining costs.

*(c)* The costs attributable to the operation of warehouses or distribution terminals for manufactured products shall be considered as nonmining costs. Accordingly, all profits attributable thereto are treated as nonmining profits. *Reg. 1.613–3(g)(3)*

Transportation the primary purpose of which is marketing, distribution, or delivery for the application of only nonmining processes shall not be considered as mining.

The quoted regulations (hereinafter referred to as the 1968 Regulations) deal specifically with the issues relating to the bag premium, the cost of bagging, loading costs, and the costs of operating terminal facilities. In each case the regulations clearly dictate the result favored by the government, i. e., that bag cement, as well as bulk cement, be treated as the first marketable product and therefore that bag premiums be included in the proportionate profits as part of gross sales, and that bagging costs, loading costs, and the costs of operating terminal facilities be treated as nonmining costs.

The government urges that the 1968 Regulations, which purport to apply to all taxable years governed by the Internal Revenue Code of 1954, should be retroactively applied to all of the taxable years at issue here. Noting that the Ninth Circuit, in *United States v. California Portland Cement Co.*, 413 F.2d 161 (1969), [hereinafter cited as *California Portland*] did apply these regulations retroactively, the government argues that these regulations meet the test for retroactive application enunciated by this circuit in *Anderson, Clayton and Co. v. United States*, 562 F.2d 972 (5th Cir. 1977), *rehearing en banc denied*, 565 F.2d 1215 (1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785. Because we reach the same result considering only the pre–1968 Regulations and the applicable case law, we do not reach the question of the retroactive application of the 1968 Regulations. However, it is clear that the 1968 Regulations do govern the last taxable year here involved, the calendar year 1968. With respect to that year, we affirm the decision of the district court, with respect to the treatment of bag premiums, bagging costs, loading costs, and the costs of operating terminal facilities, on the authority of the 1968 Regulations.

Our consideration of the remaining taxable years, i. e., calendar years 1960–1967, will be based on the regulations [10] in effect before the 1968 Regulations, and the applicable case law.

10.  Treas.Reg. 118, § 39.23(m)–1(e)(3).

C. Primary Case Law and the Proportionate Profits Regulation

A review of the four cases which have considered the proper handling of the bag premium, the costs of bagging, and the costs of loading and other distribution costs will aid our resolution of the issues before us. Taxpayer places primary reliance upon *United States v. Ideal Basic Industries, Inc.*, 404 F.2d 122 (10th Cir. 1968), *cert. denied* 395 U.S. 936, 89 S.Ct. 1997, 23 L.Ed.2d 451 [hereinafter cited as *Ideal Basic*].[11] That case dealt with items identical to those at issue here—bag premium, cost of bagging, cost of loading bulk cement, and the costs of warehouses and distribution terminals—in the context of the proportionate profits method. The Tenth Circuit held that the bag premiums and all of the aforesaid cost items should be excluded from the proportionate profits formula. The reasoning employed by the court was: first, that bagging, loading, transportation to warehouses and distribution terminals, and warehousing are nonmining expenses which relate to the manufactured product (bulk cement) and not to the mining of the crude mineral (kiln feed); and second, that therefore these items must simply be excluded from the formula. We agree with the first step of this reasoning,[12] but not the second step. As authority for the second step, the *Ideal Basic* court simply cites *Standard Lime and Cement Co. v. United States*, 329 F.2d 939, 165 Ct.Cl. 180 (1964) [hereinafter cited as *Standard Lime*].[13] Our discussion below will demonstrate why we believe this reliance on *Standard Lime* was misplaced.

In *California Portland*, the Ninth Circuit considered the proper treatment of bag premiums and the cost of bags and bagging in applying the proportionate profits method. It held that the premium and the bagging costs must be included in the formula and that the bagging costs should be considered nonmining costs. 413 F.2d at 169. The court also reversed the district court's conclusion that bulk cement was the first marketable product, holding that the first marketable product was merely cement with no distinction as to the form of packaging. Although the Ninth Circuit held that the 1968 Regulations were retroactive and clearly required this result, it also held that the 1939 Regulations and the applicable case law lead to the same result.[14] The court relied on *Whitehall Cement Manufacturing Co. v. United States*, 369 F.2d 468 (3rd Cir. 1966) [hereinafter cited as *Whitehall*], and expressly rejected *Ideal Basic.*

In *Whitehall* the Third Circuit considered the proper treatment, in the proportionate profits context, of the costs of loading bulk cement onto rail cars and trucks, and the proper treatment of bag premiums and costs. The court rejected the taxpayer's argument that bag premiums and the costs of bagging and loading should be excluded from the proportionate profits formula. The *Whitehall* court also considered finished cement, without distinction as to packaging, to be the first marketable product. 369 F.2d at 471. The court rejected taxpayer's "erroneous assumption" that its bagging costs produced only the premium revenue, finding instead that it was reasonable to infer that taxpayer's sale of bagged cement was an accommodation to customers, induced such sales, and at least partially contributed to substantial profits. 369 F.2d at 474. The court treated the loading and bagging costs as nonmining costs. 369 F.2d at 473, 474.

11. In *Portland Cement Co. of Utah v. Comm'r*, 614 F.2d 724 (1980), the Tenth Circuit recently followed its *Ideal Basic* decision.

12. Accord *California Portland; Whitehall Cement Mfg. Co. v. United States*, 369 F.2d 468 (3rd Cir. 1966).

13. The *Ideal Basic* court also cited *United Salt Corp. v. Comm'r*, 40 T.C. 359 (1963), *affirmed* 339 F.2d 215 (5th Cir. 1964), as secondary authority. Because *United Salt* involved the determination of the "first marketable product" in a context different from the proportionate profits method, the case is inapposite. See discussion in subpart D.

14. This is not merely an alternative holding. Two of the taxable years involved, fiscal years 1953 and 1954, were prior to the retroactive effective date of the 1968 Regulations, and therefore were controlled only by the 1939 Regulations and applicable case law. 413 F.2d at 164.

Both the taxpayer and the government rely on *Standard Lime*. Although the language used by the Court of Claims has undoubtedly and understandably misled the taxpayer, we conclude that the holding of the case supports the government's position here. *Standard Lime* did say that "packing and loading costs are indirect costs which are not incurred for the benefit of the entire operation and as such cannot be included in taxpayer's computation of gross income from the property at kiln feed." 329 F.2d at 948. With regard to the cost of bags and the other costs incurred in the bagging operation, the court said: "Thus, the entire amount of this expense must be eliminated from the computation for the same reason that packing and loading costs of bulk cement (and a percentage of the total profits attributable to them) must be excluded from the computation as an indirect cost which is not incurred for the benefit of the entire mining–manufacturing operation." 329 F.2d at 949. This is the language that has led the taxpayer astray. To understand this language, it is necessary to analyze carefully the particular proportionate profits formula which was being used by the Court of Claims and to understand how the formula used by the Court of Claims differs from the formula we apply. Gross income from mining was referred to as "gross income from the property at kiln feed point" and was computed by adding items (a), (b), and (c):

(a) Total direct cost up to kiln feed;

(b) Percentage of indirect cost allocable to process up to kiln feed, calculated as follows:

$$\frac{\text{Direct cost up to kiln}}{\text{Total processing direct costs}} \times \begin{array}{l}\text{Indirect costs}\\\text{which can be}\\\text{allocated}\end{array}$$

(c) Percentage of net profits allocable to kiln feed.

Item (c), the percentage of net profits allocable to kiln feed, is in turn calculated as follows:

(i) Gross income from end product (sales price × units sold)

(ii) Less Total costs in producing end product

(iii) Profit from entire operation

(iv) Less Profit attributable to indirect costs which cannot be allocated

(v) Allocable net profit

(vi) $\dfrac{\text{Direct cost up to kiln}}{\text{Total processing direct costs}} \times \begin{array}{l}\text{Allocable}\\\text{net profit}\end{array} = \begin{array}{l}\text{Net profit}\\\text{allocable}\\\text{to kiln}\\\text{feed}\end{array}$

Step (iv) in item (c) of the *Standard Lime* formula is the crucial step in the computation by which that court eliminated from the depletable base the profits attributable to the costs of loading and distribution and the costs of the bagging operation. The *Standard Lime* court labeled these costs as indirect costs which did not relate to the mining phase and which were not incurred for the benefit of the entire operation. Applying the formula, such costs are "indirect costs which cannot be allocated" and thus are not included in item (a) or in item (b),[15] and the proportionate profits attributable to these costs are excluded from the deplet-

---

**15.** Although the *Standard Lime* formula properly excludes from the depletable base all of the cost items at issue here and also the proportionate profits attributable thereto, thus accomplishing the major goal sought by the government in the instant case, the *Standard Lime* treatment is different from the treatment urged by the government in one respect. Item (b) of the *Standard Lime* formula determines the allocation between the mining and nonmining phases of "indirect costs which can be allocated." The prime example of such indirect costs is overhead expenses (we will refer to all allocable indirect costs by the shorthand term "overhead expenses"). Item (b) of the formula makes this allocation by multiplying such "overhead expenses" by a fraction, the numerator of which is "*direct* costs up to kiln" and the denominator of which is "total processing direct costs." As note 19, 329 F.2d at 948, makes clear, the *Standard Lime* court's labeling of the cost items at issue as "indirect" means that these costs are eliminated from the denominator of item (b)'s fraction. This, of course, results in a larger amount of "overhead expenses" being allocated to the mining phase. The effect of this particular aspect of the *Standard Lime* formula is to allocate "overhead expenses" only to the "direct" mining phase and the "direct" manufacturing–nonmining phase, thus making no allocation of "overhead expenses" to distribution and marketing operations. We believe it is erroneous to assume that "overhead expenses" are not related at all to distribution and marketing operations. We doubt that the *Standard Lime* court intended to do this. For these reasons, we reject this particular quirk in the *Standard Lime* formula.

able base by step (iv). This exclusion properly results in a figure for the depletable base which includes only the cost up to the kiln feed, i. e., mining costs, and the profits attributable thereto, and which accordingly excludes loading and bagging costs and the profits attributable thereto. Thus, the exclusionary language is proper with respect to the particular *Standard Lime* formula.

Taxpayer's error arises when it transposes *Standard Lime*'s exclusionary language to the very different formula being used in this case. Both parties in this case use the following formula:

$$\frac{\text{mining costs}}{\text{total costs}} \times \frac{\text{gross}}{\text{sales}} = \frac{\text{gross income}}{\text{from mining}}$$
(mining + nonmining)

Had the *Standard Lime* court used the above formula, it would have included the pertinent costs as part of the "total costs"

in the denominator, because the court clearly held that the costs did not relate to the mining phase and were not allocable in any part of the mining phase. To accomplish that result one would have to *include* the costs at issue in the denominator of the fraction of the formula being used here, thus decreasing the fraction, and, when the smaller fraction is multiplied by "gross sales," accomplishing the removal of such costs and their pro rata profits from "gross income from mining." Thus, inclusion in the denominator of our formula accomplishes the same thing as exclusion from the *Standard Lime* formula.[16]

On the basis of the above analysis, we conclude that the Tenth Circuit in *Ideal Basic* improperly relied upon *Standard Lime*. With respect, we believe that the *Ideal Basic* court was misled by the exclu-

---

**16.** The example set out in the Appendix to the government's post–argument brief demonstrates that the *Standard Lime* formula and treatment of the pertinent items urged by the government in the instant case produce the same depletable base, namely $50,000.

### EXAMPLE

| | |
|---|---|
| Direct Mining Costs | 40,000 |
| Costs of Loading Bulk Cement * | 5,000 |
| Costs of Loading Bagged Cement * | 5,000 |
| Cost of Bags * | 10,000 |
| Other Direct Nonmining Costs | 20,000 |
| "Bag Premium" | 15,000 |
| Sales Receipts Net of "Bag Premium" | 85,000 |

* Labeled by *Standard Lime* as indirect cost which cannot be allocated.

#### I
#### Fractional Formula used in instant case

$$\frac{\text{Mining Costs}}{\text{Total Costs}} \times \text{Gross Sales} = \frac{\text{Gross Income}}{\text{from Mining}}$$

$$\frac{40,000}{\substack{40,000 + 5,000 + \\ 5,000 + 10,000 + \\ 20,000}} \times (15,000 + 85,000) = \underline{50,000}$$

#### II
#### Standard Lime Formula

(a) Total direct cost up to kiln feed

(b) Percentage of direct cost *allocable to process up to kiln feed*, computed as follows:

$$\frac{\text{Direct cost up to kiln feed}}{\text{Total processing direct costs}} \times \begin{array}{l}\text{Indirect costs} \\ \textit{which can be} \\ \textit{allocated}\end{array}$$

(c) Percentage of net profits allocable to kiln feed [computed as follows:]

(i) Gross income from end product (sales price × units sold)

(ii) Less total costs in producing end product

(iii) Profit from entire operation

(iv) Less profit attributable to indirect costs which cannot be allocated **

(v) Allocable "net" profit

(vi) $$\frac{\text{Firect cost up to kiln}}{\substack{\text{Total processing} \\ \text{direct costs}}} \times \begin{array}{c}\text{Allocable} \\ \text{net} \\ \text{profit}\end{array} = \begin{array}{l}\text{Net profits} \\ \text{allocable to} \\ \text{kiln feed}\end{array}$$

** Eliminated from total profit on the ratio which the cost of these "indirect expenses" which cannot be allocated bears to total cost of producing cement. 329 F.2d at 945, n. 13.

(a) 40,000

(b) 0   (None of the loading or bagging costs were incurred for the benefit of the mining phase, nor benefited the entire operation, and therefore cannot be allocated.)

(c) See below

(i) 100,000

(ii) − 80,000 (40,000 + 5000 + 5000 + 10,000 + 20,000)

(iii) 20,000

(iv) − 5,000 (5,000 + 5,000 + 10,000 (indirect nonallocable costs) / (40,000 + 5000 + 5000 + 10,000 + 20,000 (total costs)) × 20,000 (total profit) = 5000)

(v) 15,000

(vi) 10,000 $$\left(\frac{40,000}{(40,000 + 20,000)} \times 15,000\right)$$

(c) Step (vi), $10,000, is the computed result for item (c), percentage of net profits allocable to kiln feed.

Summary of *Standard Lime* formula:

(a) $40,000
(b) 0
(c) <u>10,000</u>
Total $50,000

sionary language utilized by the *Standard Lime* court in applying its very different formula. We also believe that exclusion of the cost items at issue here, as *Ideal Basic* would require, would violate the purpose of the proportionate profits method. The effect of such exclusion would be to eliminate such costs from the denominator of our formula's fraction, thereby increasing the fraction. When the fraction is then multiplied by the "gross sales"[17] figure, the effect is to include in the depletable base the costs at issue and the profits attributable thereto.[18] Thus, although the Tenth Circuit properly classifies the cost items at issue as relating only to the manufacturing or non-mining phase, its treatment of the items fails to accomplish the purpose of the proportionate profits method, i. e., elimination of such nonmining costs and their proportionate profits from the depletable base.[19]

The proportionate profits regulation in effect[20] during taxpayer's calendar years 1960 through 1967 was Treas.Reg. 118, § 39.23(m)–(1)(e)(3), which provides in part:

> If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits

attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. If the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation, of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method.

We will apply the principles derived from the above cases to, and analyze the import of the foregoing regulation on, the bagging operation in subpart D, and then the costs of loading and other distribution costs in subpart E.

### D. Bagging Operation

■ With respect to the bagging operation, taxpayer makes several arguments. First, taxpayer argues that its bagging operation produces no profit, and therefore the bag premium and bagging costs should be excluded from the proportionate profits formula.[21] The argument is that the proportionate profits formula assumes that each item of cost produces a pro rata share of the profits, that the evidence shows that the bag premium was designed simply to reimburse the costs of bagging and therefore shows that the bagging operation was a break-even operation, and that it would

---

17. "Gross sales" includes total costs plus total profits.

18. The fact that the *Ideal Basic* solution would exclude from the "gross sales" figure the bag premium is small consolation. That exclusion might be considered as reducing the depletable base by so much of the cost items as equals the premium, but still the profits attributable to such excluded costs would be left in the depletable base.

19. The failure of the *Ideal Basic* solution can readily be seen when one notes that the Tenth Circuit's computation began with the sales price of bulk cement as the "gross sales" figure in the formula. This price is obviously designed to cover the costs of loading the cement, transporting it to warehouses, and the cost of warehousing, because no separate charges are made to recover such costs. However, the computation does not in any way accomplish a

reduction of this sales price by the amount of these cost items or by their pro rata profits. Thus, although the Tenth Circuit classified these costs as nonmining, it left them, and their profits, in the depletable base as if they were mining costs.

20. This regulation was originally promulgated under the Internal Revenue Code of 1939, but was continued in force under the 1954 Code until superseded by the 1968 Regulations, pursuant to § 7807(a) of the Internal Revenue Code of 1954, and TD 6091, 1954–2 C.B. 47.

21. Taxpayer would "net" the bag premium against an equal amount of bagging costs and exclude both amounts entirely from the formula. With respect to the excess of the bagging costs over the premium, taxpayer argues this excess should receive the same favorable treatment (discussed below in subpart E) it urges for the loading and other distribution costs.

undermine the purpose of the proportionate profits method to include in the formula such a break-even operation. We reject taxpayer's argument.

We do not accept taxpayer's premise that the bagging operation produces no profit. Taxpayer's proof that the bag premium was designed simply to reimburse the costs of bagging does not constitute proof that the bagging operation produces no profit. The Third Circuit in *Whitehall*, 369 F.2d at 474, disposed of the same contention with these words:

> There is implicit in the plaintiff's argument an erroneous assumption that the packaging costs produced only the additional revenue derived from the premiums . . . .. The sale of cement in bags was presumably an accommodation to those customers whose particular requirements were such as to make the purchase of cement in bulk commercially unfeasible. The availability of packaged cement was undoubtedly a sales inducement to such customers. It seems reasonable to infer that the profits realized from the sale of packaged cement, and these were substantial, were attributable at least in part to the packaging costs.

Taxpayer concedes as much in its brief. Taxpayer notes that the bag premium was intended to recover the additional costs incurred in the bagging operation, as compared to bulk sales, "in order to realize a profit on the bagged cement equal to the profit on bulk cement." [22]

In any event, had taxpayer believed that the proportionate profits method created a distortion, it could have taken advantage of the provision in the regulations which permit application to the Commissioner to obtain permission to use some other formula in lieu of the proportionate profits formula.[23] There is no evidence that taxpayer made such application. To the contrary, taxpayer has proceeded, both in the filing of its tax returns and in the conduct of this case, on the assumption that the proportionate profits method applies.

The taxpayer's next argument turns on a determination of what is the "first marketable product" in the production of cement. Treas.Reg. 118, § 39.23(m)–1(e)(3) provides in pertinent part:

> If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the *first marketable product* resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes.

(emphasis added) Relying on the regulation, taxpayer argues that bulk cement is the first marketable product, and that the price of bulk cement should be the starting point. Since the bag premium would thereby be eliminated from the proportionate profits formula, taxpayer concludes that the costs of the bagging operation should likewise be excluded.[24] Taxpayer relies on the Tenth Circuit case, *Ideal Basic*.

On this issue, we are faced with a direct conflict among the circuits. As is apparent from our discussion in subpart C, *Ideal Basic* squarely supports taxpayer's position, both in labeling bulk cement as the "first marketable product" and in excluding the bag premium and bagging costs from the proportionate profits formula. The Ninth Circuit, in *California Portland*, rejected the taxpayer's position that bulk cement was the "first marketable product," expressly rejected the *Ideal Basic* holding and rationale, and held that the bag premium and bagging costs should be included in the proportionate profits formula, and that bagging costs should be considered nonmining costs. In other words, *California Port-*

---

**22.** Taxpayer's brief, p. 13.

**23.** Treas.Reg. 118, § 39.23(m)–1(e)(3) provides for such application.

**24.** Thus, taxpayer would "net" the premium against an equal amount of bagging costs and exclude both from the formula.

*land* squarely supports the government's position in this case. So also does the Third Circuit in *Whitehall.* As our discussion in subpart C demonstrates, the Court of Claims decision in *Standard Lime* also supports the government position here, although some of its language was understandably misleading. Having concluded in subpart C that *Ideal Basic* is not persuasive authority because of its misplaced reliance upon *Standard Lime* and because its solution does not comport, with the purpose of the proportionate profits method, we conclude that *California Portland, Whitehall* and *Standard Lime* set forth the correct law.

Before completing our discussion, we inquire whether some support for taxpayer's position can be found in several older cases [25] which, although they did not involve the proportionate profits method, did consider bagging costs in the context of determining the "first marketable product" and the depletion "cutoff" point under the pre-1960 law. Under that prior law, a taxpayer's percentage depletion was based upon its mining operations up to a "cutoff" point which was defined in the statute as including ordinary treatment processes to obtain the "first marketable product." In several such cases, the courts determined that the "first marketable product," i. e. the "cutoff" point, preceded the bagging operation, a determination that would seem to provide some support for taxpayer's position that bulk cement is the "first marketable product." [26] The Ninth Circuit, in the *California Portland* case, however, distinguished such cases with the following language:

[T]he courts were not applying the proportionate profits method, as we are here, for there was a representative market price for the crude mineral product. Instead, the courts were concerned only with determining the cutoff point at which mining ceased and, faced with this question, they held that the taxpayers were not entitled to include the costs of bagging in their gross income, because bagging was not a cost of mining. If there were a representative market price for the ground calcium carbonate [i. e., kiln feed], we would not resort to the proportionate profits method in the present case, and would then exclude *all* nonmining costs from the computation.

413 F.2d at 169 (emphasis in original). To elaborate on the distinction made by *California Portland*, if there were a representative market price for the mineral at issue here at the "cutoff" point, i. e., kiln feed, then we would not be required to use the proportionate profits method.[27] However, the parties have agreed that there is no representative market price for kiln feed, and that the proportionate profits method is applicable. When the proportionate profits method is used, one cannot simply eliminate the cost items themselves; the proportionate profits attributable to those costs must also be eliminated. It is this step that taxpayer seeks to avoid.

We think the "cutoff" point cases are inapposite for another reason. Even if we assume, with those cases, that bulk cement is the first marketable product, it does not follow therefrom that bagged cement is a separate or different product. That is, it does not follow that bagged cement is the

**25.** *United Salt Corp. v. Comm'r*, 40 T.C. 359 (1963) *aff'd* 339 F.2d 215 (5th Cir. 1964); *Standard Realization Co. v. United States*, 289 F.2d 247 (7th Cir. 1961); *Riddell v. Victorville Lime Rock Co.*, 292 F.2d 427 (9th Cir. 1961); *Townsend v. Hitchcock Corp.*, 232 F.2d 444 (4th Cir. 1956); *United States v. Utco Products*, 257 F.2d 65 (10th Cir. 1958); *Comm'r v. American Gilsonite Co.*, 259 F.2d 654 (10th Cir. 1958); *North Carolina Granite Corp.*, 43 T.C. 149 (1964); *Int'l Talc Co. v. Comm'r*, 15 T.C. 981 (1950).

**26.** To the extent that these cases support the contention that bulk cement is the "first mar-

ketable product," they lend some weight to taxpayer's argument that the proportionate profits regulation requires that the computation begin with "gross sales" of the bulk cement, thus excluding from the formula the bag premium and an equal amount of bagging costs.

**27.** Taxpayer acknowledges, in its Reply Brief, page 9, that it would be comparing "apples" and "oranges" to compare the first marketable product in the "cutoff" point context with the same term in the proportionate profits context.

second marketable product.[28] Rather, bagging is simply a way of getting the same product, namely cement, to market. Some customers might want cement in rail cars, some in trucks, some in barges, some in "piggy-back" containers, and some in bags. The product, however, remains cement.[29] Bagging, then, does not create a different product. It is an expense very similar to the expense of transporting the product to market. Treas.Reg. 118, § 39.23(m)–1(e)(3), the regulation setting out the proportionate profits method, specifically provides that transportation costs and their proportionate profits shall reduce the depletable base. By analogy to the regulation's treatment of transportation costs, we believe that bagging costs and their proportionate profits should reduce the depletable base. The regulation, therefore, supports our conclusion that the "cutoff" point cases provide no authority with respect to the proper treatment of cost items in applying the proportionate profits method.

We therefore conclude that the persuasive authority is found in *California Portland, Whitehall* and *Standard Lime.* We hold that the bag premiums should be included in the "gross sales" figure of the formula, and that the full costs of bagging should be included in the denominator of the fraction as "nonmining costs."[30] Our treatment rejects taxpayer's attempt to "net" the bag premium against an equal amount of bagging costs and exclude both from the formula, because the effect of taxpayer's attempt would be to *fail* to exclude from the depletable base the profits attributable to the bagging costs thus excluded, and because the purpose of the proportionate profits would be undermined to

the extent of that failure.[31] Our treatment will remove from the depletable base *all* bagging costs and *all* profits attributable thereto, and thus will serve the purposes of the proportionate profits method, i. e., to remove from the depletable base all nonmining costs and all profits attributable thereto.

E. Costs of Loading Cement in Bulk and Other Distribution Costs

■ With respect to the costs of loading bulk cement and the costs of operating terminal facilities, taxpayer's primary argument is that these expenses benefit the entire operation and, therefore, should be allocated between the mining and nonmining phases of its operations. Alternatively, taxpayer argues, relying upon *Ideal Basic,* that such costs should simply be excluded from the proportionate profits formula.

We reject taxpayer's primary argument, and hold that these costs do not benefit the entire operation, but rather are related directly to the nonmining phase of taxpayer's operations. Section 613(c)(4)(F) provides that treatment processes shall be considered as part of the mining phase up to the "cutoff" point, "but not including any subsequent process." The language implies that post–cutoff point "processes" are included in the nonmining phase. Taxpayer concedes as much. Taxpayer maintains, though, that these costs are distribution expenses, and not "processes." Taxpayer's argument is that mining processes occur up to the "cutoff" point, that thereafter manufacturing or nonmining processes occur (e. g., the heating in the kiln, the cooling and grinding of the clinker into finished cement), but that these manufacturing processes cease when the manufactured

---

**28.** We reject the Tenth Circuit's label when it called bagged cement the second marketable product. *Ideal Basic,* 404 F.2d at 126.

**29.** Accord, *California Portland,* 413 F.2d at 169, 175; *Whitehall,* 369 F.2d at 471.

**30.** We hold that the bagging costs are nonmining costs for the same reasons, discussed in subpart E, that loading and other distribution costs are nonmining costs.

**31.** In other words, taxpayer's attempt to "net" the bag premium against an equal amount of bagging costs would decrease "nonmining costs" by the amount of the excluded bagging costs, thereby reducing the denominator of the proportionate profits fraction by the amount of the excluded costs, and thus increasing the fraction. When the increased fraction is then multiplied by "gross sales," the result is to *leave in* the depletable base (i. e., "gross income from mining") the profits attributable to such excluded costs.

product, i. e., cement, emerges. Thereafter, taxpayer argues, its expenses are distribution expenses which benefit the entire operation, and therefore should be allocated between the mining and nonmining phases. It is significant that taxpayer cites no cases to support this particular treatment of such cost items.[32] On the other hand, three cases oppose taxpayer's treatment. In *Whitehall*, the Third Circuit treated the cost of loading bulk cement into freight cars and trucks as a nonmining cost. In *Standard Lime*, the Court of Claims held that such loading costs and warehousing costs were distribution expenses which did not benefit the mining operations, which did not benefit the entire operation, and therefore no part of which could be allocated to the mining phase. In *California Portland*, the Ninth Circuit held that the cost of bagging cement was a nonmining cost.[33]

In addition, the history of the relevant statute and regulations suggests that such costs are *processes*. Section 613(c)(4) provides that "loading for shipment" is an allowable "treatment process" for several named minerals and other "ores or minerals which are not customarily sold in the form of a crude mineral product." This same language, suggesting that "loading for ship-

ment" is a *process*, appeared in the predecessor statute.[34] Similar language appears not only in the current regulations[35] but also in the regulations issued under the Internal Revenue Code of 1939.[36] Also, Section 613(c)(2), both before and after the 1960 amendments, included within the definition of mining so much of the transportation of the mineral from the mine to the processing plant as is not in excess of 50 miles. The regulations have contained similar provisions.[37] Thus, we see that other portions of the same statute, and regulations thereunder, treat loading for shipment and transportation of the mineral as "processes." This history of the statute and regulations persuades us that the loading and distribution costs at issue are "processes," and do not cease to be "processes," as taxpayer urges, simply because they occur after the manufactured product, cement, emerges.

More importantly, to allocate or exclude loading and distribution costs from the proportionate profits formula would be to treat these costs differently from similar costs which clearly must be attributed to nonmining phases. The regulation in effect for all taxable years at issue except 1968, Treas.

**32.** Although *Ideal Basic* holds that similar distribution costs are to be excluded entirely from the proportionate profits formula, rather than allocated as taxpayer here argues, the Tenth Circuit case does contain language supportive of taxpayer's argument that the manufacturing–nonmining processes cease when cement emerges. See 404 F.2d at 126. For the reasons stated in the text immediately below, we decline to follow this implication in *Ideal Basic*.

Language in *Standard Lime* would seem superficially to support taxpayer's position. The Court of Claims accepted the "uncontradicted opinion" of that taxpayer's expert witness and found "that the post–kiln feed processes end at the point where the materials in the form of cement come to rest in the storage silos." 329 F.2d at 944–45, n.12. Accordingly, the Court of Claims labeled such costs as "indirect" expenses, as opposed to direct processing costs. However General Portland can take little comfort in the *Standard Lime* label because, as discussed in subpart C, the Court of Claims held that these indirect costs did *not* benefit the entire operation and therefore no part of these costs could be allocated to the mining phase. Logically and properly, the *Standard Lime*

court reduced the depletable base by the amount of these costs and the proportionate profits attributable thereto. Thus, the *Standard Lime* court, applying its very different formula, achieved the major goals sought by the government here in its classification of these costs as "nonmining" costs.

**33.** Although bagging cement is a different physical process from loading bulk cement and operating distribution facilities, it is similar in that all are part of the process of delivering the product to the customer. The applicable principles are the same.

**34.** Section 114(b)(4)(B) of the Internal Revenue Code of 1939.

**35.** Treas.Reg. § 1.613–4(d)(2) and (f)(2).

**36.** Treas.Reg. 118, § 39.23(m)–1(f)(1).

**37.** Treas.Reg. 118, § 39.23(m)–1(e)(2); Reg. 1.613–4(f)(iii). Cf. also Treas.Reg. § 1.613–4(g)(3) which provides that transportation for the purpose of marketing and distribution is nonmining.

Reg. 118, § 39.23(m)–1(e)(3), specifically provides that transportation costs and the proportionate profits attributable thereto shall reduce the depletable base. The regulation provides in pertinent part:

If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) *minus the costs and proportionate profits attributable to the transportation* (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes.

(emphasis added) We do not believe there should be a difference in treatment between the loading and distribution costs at issue–i. e., the cost of loading bulk cement onto a truck and the cost of operating terminal facilities to which the truck delivers the cement–on the one hand, and the sandwiched transportation costs–i. e., the costs of trucking the cement after the loading and before delivery to the terminal–on the other hand. If such transportation costs are to reduce the depletable base, as the proportionate profits regulation provides, then so also should the loading and terminal facility costs which occur, respectively, immediately before and after that transportation.

On the basis of the case law, the regulations, and the history of the statute and regulations, we reject taxpayer's primary argument and hold that the loading and distribution costs at issue here are post "cutoff" point processes, and are therefore nonmining costs.

Taxpayer's alternative argument, that the loading and other distribution costs should simply be excluded from the proportionate profits formula, relies upon the Tenth Circuit case, *Ideal Basic.* In subpart C we concluded that *Ideal Basic's* reliance on *Standard Lime* was misplaced and that its treatment of the cost items at issue violated the purpose of the proportionate profits method. We, therefore, reject taxpayer's attempt to exclude these cost items from the formula. We follow the holdings of *California Portland, Whitehall* and *Standard Lime;* we follow the implications in Reg. 39.23(m)–1(e)(3), and in the history of the statute and regulations as discussed above. We hold that the loading and distribution costs at issue are nonmining costs. This will accomplish the purpose of the proportionate profits method, i. e., the exclusion of these nonmining costs and their pro rata profits from the depletable base.

IV. DISCOUNT ISSUE

During each of the taxable years at issue here, the taxpayer offered a discount to its customers. For the first taxable year, 1960, and part of 1961, the discount was 10¢ per barrel for gray cement and 20¢ per barrel for white cement. In 1961, the discount was increased to 20¢ per barrel for gray cement and 40¢ per barrel for white cement. It remained at this level for the succeeding taxable years. Until January 1, 1964, the terms of the discount required payment of the discounted price within 15 days from the invoice date, or payment of the full price within 30 days of the invoice date. The terms were changed effective January 1, 1964, and for 1964 and succeeding taxable years, the terms of the discount required payment of the discounted price by the 10th of the month for shipments invoiced during the previous month, or payment of the full price by the last day of that month.

The district court found, and its finding is amply supported in the record, that taxpayer strictly enforced its discount policy.

For the years at issue, between 90% and 95% of taxpayer's customers took advantage of the discount, and 5% to 10% did not. By dollar volume, approximately 95% of the potential discounts were allowed by taxpayer, and approximately 5% either were not taken advantage of by the customer or were affirmatively disallowed by taxpayer. Of that 5%, between 15% and 20% were affirmatively disallowed, the balance of the customers having paid the full price without attempting to obtain the discount rate.

Thus, taxpayer affirmatively disallowed the discount in approximately 1% of the sales.

It is undisputed that most other competing cement manufacturers offered a discount with terms similar to those offered by taxpayer.

It is also undisputed that both the 1961 increase in the amount of the discount and the 1964 change in the terms of the discount were made by taxpayer at the same time the industry made similar changes and that taxpayer's changes were in response to competitive forces.

The government introduced evidence to support its argument that the terms of the discount were not essentially equivalent to interest, namely, that the discount did not represent a fair rate of interest for taxpayer to pay for the use of money, i. e., for the use of the prepaid discounted price. The government's witness, Mr. Townsend, testified that taxpayer's various discounts were equivalent to interest at an annualized rate ranging from 73% to 128%.[38] The witness determined the amount of the discount (e. g., 20¢ per barrel), and the discount percent[39] (e. g., on a sales price of $3.75 per barrel, the 20¢ per barrel discount represents a 5.3% discount.) The witness considered that taxpayer was paying an interest equivalence in the amount of the discount for use of the money–i. e., for the use of the prepaid discounted price–for the prepayment period–i. e., the length of time between the date by which the discounted price must be paid in order to obtain the discount and final due date of the account[40] (e. g., 20 days when the discount terms provided for payment of the discounted price by the 10th day of the month following shipment or payment of the full price by the end of that month). Based on these determinations, Mr. Townsend calculated the annualized rate of interest represented thereby.[41] Mr. Townsend's calculations were based on the median mill price of bulk cement for taxpayer's various cement products. These prices did not include the 40¢ to 60¢ extra which would be reflected in taxpayer's sales of bagged cement, which were approximately 10% to 20% of taxpayer's sales. Nor did these mill prices include the freight charge which would have been included in a customer's invoiced delivered price. Taxpayer's official estimated that freight charges would range from 50¢ to 75¢ per barrel.

There was evidence that the most prevalent cash discount in the business community in general was the "2/10 net 30" discount. This discount entitled the customer to a 2% reduction if the discounted price is paid within 10 days, or the full price must be paid within 30 days. This "classic" discount represents an annualized interest rate of 37%.

Taxpayer asserts two purposes for its discount: to encourage prompt payment and to insure ultimate collection. Taxpayer argues that its discount is a cash discount which is entitled to a favorable treatment, which we explain as background for our discussion of the discount issue. Taxpayer argues that its full, undiscounted sales price should be included in the gross sales figure

---

**38.** See defendant's exhibit 5, pp. 9–10, and Table 8.

**39.** We will use the shorthand term "discount percent" to refer to the percent of the sales price represented by the discount.

**40.** We will refer to this time period by the shorthand term "prepayment period."

**41.** Mr. Townsend's formula for the calculation was:

$$\frac{\text{discount \%}}{(100 \text{ minus discount \%})} \times \frac{365}{\text{prepayment period}}$$

An example of Mr. Townsend's calculation of the interest equivalence of a discount of 20¢

per barrel on a sales price of $3.75 per barrel with discount terms providing that the discounted price be paid by the 10th day of the month following shipment or the full price by the end of that month:

$$\frac{5\% \text{ (rounded down from 5.3\%)}}{(100 \text{ minus } 5\%)} \times \frac{365}{20} = 96\%$$

Thus, Mr. Townsend's testimony was that the 20¢ discount in the example was the equivalent of interest at an annualized rate of 96%. See defendant's exhibit 5, p. 10.

of the proportionate profits formula[42] and that the discount should be treated as an expense incurred by taxpayer for the benefit of the entire operation, thus to be allocated in part to the mining phase and in part to the nonmining phase. The effect would be to increase the "gross sales" figure in the formula, thereby increasing "gross income from mining" and increasing taxpayer's percentage depletion deduction.

The government, on the other hand, argues that the effect of the treatment taxpayer seeks is to give taxpayer a percentage depletion deduction, based not only on the discounted sales price which it actually receives, but also on the discount amount itself, which taxpayer does not receive. The government argues that the appropriate treatment is to reduce the sales price by the discount, and thus include in the gross sales figure of the proportionate profits formula only the discounted price actually received.

The district court stated the issue as whether the discounts are cash discounts or trade discounts, and characterized the question as one of fact. Quoting from *Standard Lime*, the court distinguished cash discounts, which it described as discounts granted to encourage prompt payment, from trade discounts, which it described as discounts available without regard to the time of payment. The court held that the discounts at issue were cash discounts and entitled to the favorable treatment taxpayer seeks. The court divided its inquiry into two steps. First, the court found, as a matter of fact, that the actual policy and results of taxpayer's business were that the discounts were granted to induce prompt payment. Subsidiary supportive findings included:

(1) Taxpayer offered the discount to induce early cash payment;

(2) The discount was effective in collecting 90% to 95% of the accounts receivable;

(3) Taxpayer strictly enforced the cash discount; and

(4) Strict enforcement of the cash discount was achieved through close supervision of personnel who were allowed to give discounts.

In the second step of its inquiry, the district court held that the interest equivalency test, if applicable at all, was improperly applied by the government. The court rejected the government's interest equivalency test on the ground that the "prepayment period" used by the government's witness was not supported in the evidence because collections often were not made until some time after the final due date.

The district court committed legal error in its holding that the government improperly applied the interest equivalency test. We hold that the government properly applied the test and that the district court's refusal to consider the interest equivalency factor was legal error. Assuming arguendo that the ultimate determination of the purpose of the discount and the classification as a cash discount or a trade discount is a question of fact,[43] we conclude that the discount at issue is a trade discount. Because the contrary conclusion, i. e., a determination that the discount is a cash discount, would be clearly erroneous on the facts of this case, we need not remand to the district court to make findings of fact applying the standards we set out.

We turn first to the interest equivalency test.[44] We hold that the proper "prepayment period" is, as the government urges,

**42.** The proportionate profits formula is:

$$\frac{\text{mining costs}}{\text{total costs}} \times \text{gross sales} = \frac{\text{gross income}}{\text{from mining}}$$

**43.** Because both parties in the instant case have treated this as a question of fact, we have assumed arguendo that it is, without deciding what is the appropriate standard for appellate review. See Wright and Miller, *Federal Practice and Procedure*, § 2589. See also *Suburban Realty Co. v. United States*, 615 F.2d 171 (5th Cir. 1980).

**44.** Reg. 1.613–4(e) provides that the gross sales figure in the proportionate profits formula shall be reduced by cash discounts, as well as by trade discounts. However, this provision is applicable only to years beginning after November 30, 1968. Therefore, the regulation is not applicable to the taxable years in this case.

the time between the final due date of the account and the date by which the discounted price must be paid in order to be eligible for the discount. The Ninth Circuit so held in *California Portland*. Rev.Rul. 60–257 [45] so held. On the other hand, the court below cited no authority for its suggestion that the "prepayment period" should include the period during which any accounts were delinquent. We respectfully reject this suggestion of the district court, both on the basis of the authorities cited and because common sense points us to this conclusion. For example, if the final due date of an account is the last day of August, and the last date on which the discounted price can be paid is August 10, then it seems to us rather clear that both parties would ordinarily contemplate that the time period for which the prepaying customer would lose the use of his money, and conversely the extra time that the seller would have the use of the money, is the approximately 20 days between August 10 and the last day of August.

We further hold that there is no need for the district court on remand to reconsider the question of whether the discount here is substantially equivalent to a charge in the nature of interest for the use of the prepaid discounted price. The errors in the government's evidence, as pointed out by the taxpayer,[46] are not significant, and the evidence in the record clearly shows that the discount represents an interest equivalence far in excess of the prevailing interest rate, which the record shows would range from 4% to 7%. Accordingly, we hold that the discount at issue is not substantially equivalent to a charge in the nature of interest.

The interest equivalency test is only one of the factors to weigh in determining whether a discount is a cash discount or a trade discount. We next examine the relevant authorities to flesh out the other factors, and articulate the standards to be applied in distinguishing cash from trade discounts.

Taxpayer relies primarily on *Standard Lime*.[47] Taxpayer asserts that *Standard Lime* involved the same discount that we must evaluate, that the government conceded it was a cash discount, and that the case is controlling. The discount in *Standard Lime* does appear identical to the one at issue here for the taxable year 1960 and part of 1961. However, because the government conceded that the discount was

---

**45.** 1960–2 C.B. 197.

**46.** Taxpayer argues that the government's expert witness, Mr. Townsend, used mill prices for bulk cement, whereas 10% to 20% of its sales, being sales of bagged cement, would have sold for 40¢ to 60¢ more. Taxpayer also argues that Mr. Townsend's use of mill prices left out the freight charges which would have been included as part of the invoiced delivered price. In both cases, taxpayer argues that the average price would be increased, while the discount (e. g., 20¢ per barrel) would remain constant, thereby decreasing the discount percentage and thereby decreasing the interest equivalency of the discount. We have made calculations, adding both bagging and freight costs to the prices used by Mr. Townsend, and have concluded that the resulting change in the interest equivalency is not significant. The revised interest equivalency of the discount far exceeds the prevailing interest rate at the time. Taxpayer's own Vice President of Finance conceded as much.

Our calculations of the interest equivalency, taking into account the bag premium and the freight charges, indicate an annualized interest rate of 61.3% for January 1, 1960, to November 1, 1961; of 120.9% for November 1, 1961, to January 1, 1964; and of 86.3% for January 1, 1964, to December 31, 1968. We calculated these annualized rates using the Townsend formula. We took the median mill price for bulk cement per barrel from Table 8, Def.Ex. 5. Table 8 reflects a median mill price of $3.55 per barrel in 1964, $3.60 in 1965 and 1966, and $3.75 in 1967 and 1968. To give the taxpayer the benefit of any doubt, we used the highest figure. We added a 50¢ per barrel bag premium for 15% of the sales and a 60¢ per barrel freight charge.

**47.** The other two cases, cited by taxpayer, *Riverside Cement Co. v. United States*, 2 A.F.T.R.2d 6175 (S.D.Cal.1958), and *California Portland Cement Co. v. Riddell*, 3 A.F.T.R.2d 438 (S.D.Cal.1958), *rev'd and remanded on other issues*, 297 F.2d 345 (9th Cir. 1962), are cryptic district court cases both of which find, in conclusory fashion, that primary purpose of the discount is prompt payment, and conclude that the discount is a cash discount without citation of authority or analysis. We accord them little weight.

a cash discount; the discussion of the Court of Claims is dictum. We need not consider the precedential value, if any, of the government's concession because Rev.Rul. 60–257, clarifying the Internal Revenue Service position on cash discounts, was prospective only, to apply only to taxable years after January 1, 1960. The government's concession in *Standard Lime* related to the taxable year 1954, and the Internal Revenue Service had served notice that it would apply the stricter standard of Rev.Rul. 60–257 beginning in 1960.[48]

*Standard Lime* also distinguishes cash discounts from trade discounts, saying that the former are granted to encourage prompt payment and are optional with the customer, while the latter are granted at the option of the seller and do not depend upon when payment is made. As note above, this definition is dictum. Our analysis leads us to the conclusion that this is only one[49] of several factors to be weighed in the determination of whether a discount is a cash discount entitled to the favorable tax treatment which taxpayer seeks.

■ *Standard Lime* also stated that "trade discounts are deemed reductions in the sales price thus not includable in taxpayer's gross income." 329 F.2d at 947, n.18. This statement comports with our understanding of the law.[50]

In *California Portland* the Ninth Circuit dealt with the discount issue in the cement industry. The court held that a discount very similar[51] to the one at issue was a trade discount, and not a cash discount, entitled to the favorable treatment taxpayer urges. The court below had made a finding of fact, very similar to that in the instant case, that the purpose of discount was to induce prompt payment and that the discount was a cash discount. The Ninth Circuit found that the discount—calculated in the same manner as the interest equivalency has been determined in the instant case—did not represent a fair interest rate. The court concluded on the basis of that fact, plus the fact that the discount was rarely disallowed, plus the fact that the same discount was prevalent in the industry, that the discount was a trade discount and not a cash discount.

Taxpayer argues that *California Portland* can be distinguished because the discount there was rarely disallowed. Only .03% of the discounts there were disallowed, compared to approximately 5%, by dollar volume, in the instant case. We do not find this difference sufficient to distinguish *California Portland*; we consider the discounts disallowed in the instant case to be small in comparison to the total discounts available.

Taxpayer next argues that *California Portland* is distinguishable on the basis of the substantial evidence in our case that General Portland strictly enforced its discount policy. We note that the Ninth Circuit did not indicate whether or not the discount policy was strictly enforced; it noted only that in one of the taxable years there involved discounts of only $347 were disallowed while $1,000,000 in discounts were allowed. Nevertheless, we do consider the demonstrated strict enforcement of taxpayer's discount policy to be an important factor favoring the taxpayer's position, and providing some evidence that the discount was not a disguised price reduction for competitive purposes. We will weigh this fac-

**48.** In Rev.Rul. 60–257, the Service noted that the determination of cash discount status had strayed in some instances from the strict determination of whether the discount represented a fair interest rate to a less strict standard of whether the discount was a reasonable one in light of customary trade practices. The Service ruled prospectively that in determining gross income from mining, gross sales should be reduced by any prepayment discount "unless the discount is a cash discount and one that under all the circumstances is substantially equivalent to a charge in the nature of interest for the use of the net amount paid in advance of the date when it was otherwise due and payable." 1960–1 C.B. at 198.

**49.** This is the first factor discussed below as favorable to taxpayer.

**50.** Accord *California Portland*; Rev.Rul. 60–257, 1960–2 C.B. 197.

**51.** Five and one–half percent discount (20¢ on sales price of $3.63) for a "prepayment period" of about 20 days. 413 F.2d at 174, 175.

tor in taxpayer's favor in our application of the legal standards to the facts of this case.

In Rev.Rul. 60–257 the Internal Revenue Service ruled that:

> [I]n determining 'gross income from the property' for percentage depletion purposes the gross selling price should be reduced by the amount of any prepayment discount allowed by the taxpayer and utilized by the purchaser unless the discount is a cash discount and one that under all the circumstances is substantially equivalent to a charge in the nature of interest for the use of the net amount paid in advance of the date when it was otherwise due and payable.

1960–2 C.B. at 198. The ruling clarified the earlier Rev.Rul. 55–13 [52] and clarified the acquiescence in *Montreal Mining Company v. Commissioner*, 2 T.C. 688 (1943), acq. 1944 C.B. 20. The ruling approved the result in *Montreal Mining* because the discount there constituted in substance a payment by the taxpayer for the use of the net purchase price for time period of the prepayment, and represented a fair interest rate.[53] The Ruling pointed out that to allow the favored treatment to a discount which did not reflect a fair rate of interest would be to allow taxpayer percentage depletion on amounts to which taxpayer was never entitled and could never collect.

We note that the ruling requires that the discount be *both* a cash discount and one which is substantially equivalent to interest. As our analysis in the next two paragraphs indicates, we do consider interest equivalency to be an important factor, but we do not adopt the ruling's position that interest equivalency is a prerequisite.

We turn now to analyze the cash discount at issue and the favorable treatment tax-payer seeks, in light of the purpose behind the percentage depletion deduction. We can see that it is reasonable to treat as an expense a payment for the use of money for the "prepayment period." This is substantially equivalent to a simple bank loan by taxpayer, secured by his account receivable and repayable when the account receivable is due. Such interest would be an expense allocated between the mining and nonmining phases. In the bank loan situation, of course, the full account receivable is received and would be included in the gross sales figure. To the extent that the substance of a discount situation is like the bank loan, the treatment taxpayer seeks is proper. Rev.Rul. 60–257 so holds. Thus, we conclude that if a cash discount were essentially equivalent to interest, taxpayer's treatment would comport with the purpose of percentage depletion.

However, we are not convinced that a discount, to qualify for the favorable treatment, must be approximately equal to the prevailing interest rate. We concede to the government that a taxpayer, using good business judgment, would not pay more than the prevailing interest rate just to encourage customers to pay 20 days early. The taxpayer here, however, asserts an additional purpose, i. e., to insure ultimate collection. We conceive that a cement manufacturer might be willing to offer a discount which reflects a rate of interest somewhat higher [54] than the prevailing interest rate in order to encourage customers to pay their bills. The manufacturer may well deem the monetary sacrifice for prompt and early payment reasonable in the construction trade where contractors often experience cash flow difficulties. Sometimes the early bird is the only one who gets a worm.

---

52. 1955–1 C.B. 285.

53. The discounts in *Montreal Mining* were computed at an annualized rate of 5% or 6%. It was found that these rates were higher than the prevailing rate at that time, but were nevertheless a fair interest rate. 2 T.C. at 691, 697.

54. We need not decide in this case what size discount is necessary or appropriate to serve the purpose of insuring ultimate collection.

The only evidence in this record bearing on this subject is the evidence of the classic "²/₁₀ net 30" discount which represents an annualized interest rate of 37%. We express no opinion as to the appropriateness of that discount, but we note that taxpayer's discount far exceeds 37%, and that taxpayer has introduced no evidence to demonstrate why it was necessary to have such a large discount to accomplish its legitimate purpose.

A discount for the sole purpose of ultimate collection, like expenses for credit reports and other collection expenses and like interest expenses, would properly receive the favorable treatment taxpayer seeks. Such a discount would in substance be the same as if taxpayer did receive the full, undiscounted sales price, but then incurred a financial expense to ensure collection.

Applying the above principles to the facts of the instant case, we consider that three facts are potentially favorable to taxpayer: (1) the fact that the discount was tied to prompt payment; (2) the fact that the discount policy was effective in accomplishing the prompt collection of approximately 95% of taxpayer's collections; and (3) the fact that the policy was strictly enforced.

The first fact, the tie to prompt payment, is of course a prerequisite, but it does not foreclose the possibility that the discount might also serve a significant, competitive price–reducing function. *California Portland* so holds.

Similarly, the second fact is not persuasive. Although it is obvious that the larger the discount, the more effectively it will encourage prompt payment, it is also obvious that the larger the discount, the greater the likelihood it also serves a competitive price–reducing function.

The third fact provides the basis of taxpayer's strongest argument. It is true, as taxpayer urges, that strict enforcement of the discount policy could operate in a manner adverse to taxpayer's competitive interests. If taxpayer strictly enforces its discount policy, as the evidence demonstrates, and taxpayer's competitors do not, taxpayer's competitive position is hurt. Although we do consider this to be an important factor in favor of taxpayer's position, we will weigh this factor, keeping in mind that any adverse competitive impact would be confined to the approximately five percent of taxpayer's sales with regard to which the

discount was not allowed. Even within this 5%, the record shows that the discount was affirmatively disallowed in only 15% to 20% of those sales, while the customer simply mailed in the full price in the balance of the sales. Thus, taxpayer affirmatively disallowed the discount in only approximately 1% of its sales.

The factors favoring the government's position are: (1) the large size of the discount; (2) the small number of sales in which the discount was not actually allowed to customers; (3) the prevalence in the industry of the same discount; and (4) the record evidence demonstrating that taxpayer's changes in its discount terms resulted from competitive forces.

First,[55] the discount at issue far exceeds the prevailing interest rate. Thus, it seems unlikely that taxpayer would pay a discount of this size merely to accelerate its collections, when taxpayer could have obtained, at a fraction of the cost, a bank loan pending payment of the accounts at the final due date. With regard to taxpayer's other stated purpose for its discount policy–to secure ultimate collection–there is no evidence in the record to explain why taxpayer had to offer a discount so large to accomplish this purpose. The record does reveal that the most prevalent cash discount in business is the "²⁄₁₀ net 30" discount. Taxpayer's discount far exceeds the classic discount. Taxpayer has not demonstrated that its discount is in substance a financial expense incurred either to encourage prompt payment or to insure ultimate collection. Such a large discount carries implications that the discount is serving not only a collection purpose, but also a competitive price–reducing purpose.

Second, the fact that only approximately 5% of taxpayer's sales, by dollar volume, did not in fact take advantage of the discount means that, for all practical purposes the

---

**55.** Whether or not the discount fluctuated with fluctuations in the interest rate would also be relevant. Changes in the discount to reflect changes in interest rates would provide some evidence of interest equivalency. In the instant case there is no evidence of such a relationship.

However, because interest rates changed so slightly during the years at issue (see defendant's Exhibit 5, Table 7), we assign no significance to the absence of changes in the discount in response to changes in the prevailing interest rates.

effective price of taxpayer's products was the discounted price.

Third, the prevalence in the industry of the same discount constitutes an implication that the discount has a competitive purpose and effect.

Fourth, the evidence in the record demonstrates that both the 1961 increase in the amount of the discount, and the 1964 change of terms—lengthening the time to pay the discounted price and the time to pay the full price—were in response to competitive forces. While the third factor provides only an implication, this fourth factor is concrete evidence that both the size and the terms of the discount at issue were influenced by competitive forces.

The determination of whether a discount is a cash discount or a trade discount must be made upon consideration of all the facts and circumstances and in light of the purpose of the percentage depletion deduction. In this case, the factors listed and discussed above are the relevant factors. The district court considered only the three factors listed above as favoring the taxpayer; we hold that the district court committed legal error in failing to consider the four factors listed above as favorable to the government. Although we reverse the district court for failure to apply the proper legal standards, we find no need for the court below to review the facts in light of these standards, because we hold that it would have been clearly erroneous on the facts in this record to find that the discount at issue did not have a significant competitive price reduc-

ing purpose and effect. Weighing the facts,[56] we conclude that the discount at issue–while it did serve effectively to encourage prompt payment and perhaps also ultimate collection–also had a significant competitive price reducing purpose and effect. This conclusion is fatal to taxpayer's case. To allow taxpayer the favorable tax treatment it seeks for the discount at issue would be to allow a deduction for amounts that do not fit within the two categories of legitimate deductions asserted by taxpayer, i. e., interest expenses and collection expenses. To allow the favorable treatment to this discount, which reflects in significant part a competitive price reduction, would be to grant taxpayer a windfall, a percentage depletion deduction based not only on the reduced sales price actually received by taxpayer, but also on the discount amount itself which taxpayer does not receive and which taxpayer has failed to demonstrate is the equivalent of a deductible interest or collection expense. We hold that taxpayer has failed to carry its burden of proving that its discount comes within the purpose of the percentage depletion deduction, which like any other tax deduction is a matter of legislative grace and must be narrowly construed.

Accordingly, we hold that, for purposes of the percentage depletion deduction, the discounts [57] at issue are trade discounts, and should not be included in the gross sales figure of the proportionate profits formula.[58]

---

**56.** We need not today decide precisely what weight to accord to each factor. We do, however, reject the position of Rev.Rul. 60–257 which makes interest equivalency a prerequisite, because a discount somewhat larger than one equivalent to interest is probably required to serve taxpayer's legitimate interest in insuring ultimate collection. However, it may well be proper to impose as a prerequisite that taxpayer prove its discount is no larger than is necessary or appropriate to serve its legitimate purposes, i. e., encouraging prompt payment and ultimate collection. We need not decide that question today, because in the instant case the taxpayer has not only failed in that proof, but also has arrayed against it the concrete evidence that its discount was influenced by competitive forces, and the fact that the dis-

counted price was the effective price in approximately 95% of taxpayer's business.

**57.** Of course, in those instances when taxpayer actually receives the full undiscounted price, taxpayer should receive its percentage depletion deduction on the full price.

**58.** We do not address taxpayer's alternative argument—that it should be entitled to reduce the 1968 year–end accounts receivable, and therefore the 1968 gross income, by the amount of the unearned discounts—because the issue was not addressed by the court below and on appeal the issue is merely raised in brief without discussion or citation of authority. We prefer for the district court on remand to consider this issue in the first instance, as well as,

## V. INTEREST ISSUE

■ For the years 1960 through 1964, taxpayer incurred interest expenses totaling $3,236,927.84. The interest expenses were primarily attributable to interest on $15 million in debentures issued by taxpayer in 1957. In the same years, taxpayer had interest income totaling $1,519,447.71. The interest income was primarily attributable to short term investments in Treasury bills and commercial paper.

The interest issue before us is whether the taxpayer may reduce his interest expense deduction by the amount of interest income earned on the borrowed funds. This issue does not involve the proportionate profits method; nor is it involved in the determination of "gross income from mining." Rather, the issue involves a separate limitation on the percentage depletion deduction. Section 613(a) provides that the percentage depletion deduction "shall not exceed 50% of the taxpayer's taxable income from the property (computed without allowance for depletion)." The regulations provide,[59] and the parties agree, that "taxable income from the property" is computed by subtracting from "gross income from mining" certain expenses, including that portion of the interest expense properly allocable to the mining phase. There is no dispute between the parties as to the proper method of allocation. The dispute is whether the proper interest expense figure is the full $3,236,927.84 or the net interest expense of $1,717,480.13, obtained by netting the interest income of $1,519,447.71 against the total interest expense. It is apparent that if the interest expense figure is reduced, as taxpayer urges, the "taxable income from the property" will be increased, thus increasing the "50% limit" and taxpayer's percentage depletion deduction.

The district court held that taxpayer is entitled to reduce its interest expense by the interest income earned on the borrowed funds.

Apparently only one case has addressed this narrow issue.[60] The government relies heavily upon *Island Creek Coal Company v. Commissioner*, 30 T.C. 370 (1958) [hereinafter referred to as *Island Creek*]. There the taxpayer realized income on the sale of certain scrap items, including steel, wire, etc. These scrap items represented waste from supplies which had originally been charged to the production costs of the mine. The taxpayer sought to set this income from its scrap salvage operations off against its current supplies and maintenance account, thus reducing that account and increasing its "taxable income from the property." The Tax Court rejected taxpayer's attempt. Relying upon cases which had refused taxpayer attempts to include in "gross income from mining" income from sources extraneous to the mining operation, and saying that the income from the scrap salvage operations was not income attributable to the mining operations and that the taxpayer could not do by indirection that which he was prevented from doing directly, the Tax Court rebuffed taxpayer's attempt to offset its scrap income against its expense of supplies.

The government and the taxpayer in this case agree, and this court agrees, that "gross income from mining" does not include income items extraneous to the mining operations. The Tax Court in *Island Creek* leapt from this truism to the conclusion that an income item could not be offset against an expense account. The Tax Court set forth no reasons or analysis other than "it is axiomatic that a taxpayer may not do by indirection that which it may not do directly." 30 T.C. at 384. Although we agree that taxpayer cannot include its in-

---

of course, the government's arguments in opposition.

59. Treas.Reg. 1.613–5(a).

60. Other cases cited by the government or by the *Island Creek* court simply hold that items of income which are extraneous to the mining operations are not included in "gross income from the property." *Guthrie v. United States*, 323 F.2d 142 (6th Cir. 1963); *Big Four Oil and Gas Co. v. United States*, 118 F.Supp. 958 (W.D.Pa.1954); *Estate of Thomas E. Arnett v. Comm'r*, 31 T.C. 320, 335–6 (1958); *Monroe Coal Mining Co. v. Comm'r*, 7 T.C. 1334 (1946).

terest income in "gross income from mining," we do not agree that the taxpayer here is seeking to accomplish that result by indirection. Whether taxpayer's interest income is part of "gross income from mining" is not, we submit, the same question as whether taxpayer's interest income is related to its actual cost for interest on borrowed funds. We cannot so easily conclude that an item, just because it is an income item under technical accounting principles, can never be an offset against an expense item. We think the purpose behind the "50% limit" argues in favor of the taxpayer in the instant case. We believe that purpose is served by subtracting the *actual* cost of interest, rather than an inflated amount. Taxpayer's actual cost of interest is its "net" interest expense. The taxpayer would not have derived the interest income had it not first incurred its interest expense. An example will reinforce our reasoning. Assume that a mining company bought, or brought to its laboratory on approval, ten aprons for the use of its laboratory personnel. Assume further that nine were kept, and one was returned. Even if the return of the tenth apron would give rise to a refund which under the company's accounting practices would be an income item, it seems clear to us that the actual cost incurred for aprons is for nine, not ten.

On the basis of the above analysis, we decline to follow the implication in *Island Creek* that a technical income item can never offset an expense item.[61] We hold that taxpayer's actual interest cost is the net amount, and that taxpayer can offset its interest income against its interest expense in calculating "taxable income from the property" for purposes of the "50% limit."

Accordingly, we affirm in part, reverse in part, and remand.[62]

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.

61. *Island Creek* can be distinguished because the income at issue there was generated from a separate scrap salvage operation which salvaged waste materials that had already been used. Such income is different from the refund "income" attributable to the returned apron in the hypothetical discussed in the text and different from the interest income in the instant case. We need not decide today how we would have decided the *Island Creek* case; we decide today only that taxpayer's actual cost for the use of money is the "net" interest expense, and

that taxpayer in this case can set off its interest income against its interest expense in computing the "50% limit" to its percentage depletion deduction. We decide today only that *Island Creek* will not be *extended* to require a result which we would consider inequitable and in violation of the purpose behind the "50% limit."

62. On remand the district court can consider taxpayer's alternative argument mentioned above in Part IV, n.58.